SALAS v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. June 24, 1916.)

No. 170.

1. CRIMINAL LAW ⚖1—OFFENSES—NECESSITY OF STATUTE.
    An agreement to give an agent a share of the profits on goods sold to his principal, however immoral, is not a crime, unless so declared by statute.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1, 2; Dec. Dig. ⚖1.]

2. CONSPIRACY ⚖33—DEFRAUDING GOVERNMENT.
    When the United States enters into commercial business, it abandons its sovereign capacity, and is to be treated like any other corporation; therefore, though it absolutely owns the Panama Railroad Company, and is the only one profiting or losing by the railroad company's activities, a conspiracy to defraud the railroad company is not a conspiracy to defraud the United States, denounced by Penal Code (Act March 4, 1909, c. 321) § 37, 35 Stat. 1096 (Comp. St. 1913, § 10201), and in such case the United States can gain redress only by suit by the railroad company to recover damages.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. ⚖33.]

3. CONSPIRACY ⚖33—OFFENSES—NATURE.
    Under Penal Code, § 37, declaring that if two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such

---

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

parties do any act to effect the conspiracy, each shall be punished, an intent to defraud the United States is essential to a conviction.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. ☜33.]

4. CRIMINAL LAW ☜113—VENUE—OVERT ACT.

Accused agreed with the manager of the commissary department of the Panama Railroad Company to divide the profits on tobacco sold to the company. Drafts representing the manager's share of the profits were delivered to him, and were ultimately paid in New York City; one being deposited to the manager's account in a Panama bank, and another being deposited to his account in an Indiana bank to take up an overdraft. Judicial Code (Act March 3, 1911, c. 231) § 42, 36 Stat. 1100 (Comp. St. 1913, § 1024), declares that, when an offense against the United States is begun in one judicial district and completed in another, it shall be deemed to have been committed in either. *Held* that, as there was no agreement whereby title to the draft remained in accused, title passed to the banks in which he deposited them; therefore payment of the drafts in New York did not constitute an overt act in connection with the conspiracy, and hence the New York District Court was without jurisdiction in a prosecution therefor.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 190, 232; Dec. Dig. ☜113.]

Chatfield, District Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Jacob L. Salas was convicted of conspiracy to defraud the United States, demurrer to the indictment having been overruled (United States v. Burke, 221 Fed. 1014), and brings error. Reversed.

William Rand, Jr., of New York City (Phanor J. Eder, of New York City, of counsel, and Vine H. Smith, of New York City, on the brief), for plaintiff in error.

H. Snowden Marshall, U. S. Atty., of New York City (F. E. Carstarphen and Harold Harper, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before COXE and WARD, Circuit Judges, and CHATFIELD, District Judge.

WARD, Circuit Judge. This is a writ of error to a judgment convicting the defendant Salas of conspiring with one Bermudez and one Burke to defraud the United States under section 37 of the Penal Code, which reads:

"Sec. 37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

Burke was called as a witness by the government, the case severed, and Salas tried alone. He did not take the stand. Burke was a citizen of the United States, residing at Cristobal, Isthmus of Panama, and manager of the commissary department of the Panama Railroad Company, a corporation of the state of New York, while Bermudez

and Salas were Spanish-Americans, residing and carrying on business at Colon in the republic of Panama.

The government proved that these three persons entered into an agreement at Colon to share equally in the profits to be made from sales of a certain brand of tobacco by Salas and Bermudez to the Panama Railroad Company. Burke, as manager of the department, was to order and pass upon the tobacco and approve the vouchers to be issued by the railroad company in payment for it. Between May 27, 1908, and February 9, 1914, such tobacco was sold to the value of about $200,000. Burke received his share of the profits made by the sellers in the form of drafts drawn in Colon upon firms or banks in New York City. These drafts are the overt acts pleaded in the indictment as intended to effect the object of the conspiracy.

[1] No actual loss is proved to have been sustained in the purchase of the tobacco. The price paid was not shown to be unfair and it was all subsequently sold at a profit. An agreement to give an agent a share of the fair profits in goods sold to his principal, however indelicate or even immoral, is not a crime unless made so by statute. There is no pretense that there is any such statute in the republic of Panama. If, however, the conspiracy was to defraud the United States, as the government contends, then there was enough evidence of constructive fraud to justify conviction under section 37 of the Penal Code, provided the conspiracy, though formed in the republic of Panama, was effected in the United States. Crawford v. United States, 212 U. S. 183, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392; Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112.

[2] The theory of the United States is that the Panama Railroad Company is a governmental department, and Burke, though on the pay roll of and paid by that company, was an officer of the United States. The trial judge so held as matter of law. The Isthmian Canal Commission was an agency of the United States under the supervision of the War Department, having complete control of the building of the canal. The United States was also the owner of the whole capital stock of the railroad company, absolutely dominating it and solely interested in its profits or losses. The government, however, continued the original corporate organization of the railroad company for its own purposes, among others to avoid the restrictions of certain laws of the United States applicable to the Commission. Accordingly there was created a department called the "subsistence department," composed of the labor, quarters, and subsistence department of the Commission, which furnished all food supplies to the employés on the Isthmus and the commissary department of the Panama Railroad Company, which bought, carried, and furnished all other merchandise and supplies. Burke was the manager of the latter. When the United States enters into commercial business it abandons its sovereign capacity and is to be treated like any other corporation. Bank of United States v. Planters Bank, 9 Wheat. 904, 6 L. Ed. 244. Although it absolutely owns the Panama Railroad Company and is the only person profiting or losing by its activities, still the railroad company sues and

is sued just like any other corporation, in its own name. If this tobacco had been deficient in quality, the railroad company could have sued Salas to recover the damages, and if it had not been paid for Salas could have sued the railroad company for the price. Therefore we are of opinion that the combination proved did not defraud or intend to defraud the United States.

[3] If, however, it be conceded that Burke, though on the pay roll of and paid by the railroad company, was an officer of the United States and acting as such in the purchase of tobacco, the agreement as proved did not, in our opinion, satisfy the requirements of the case. The statute clearly contemplates that the parties shall intend to defraud the United States and the indictment charged such an intent. The government offered in evidence a large mass of documents to prove the relations of the railroad company and the Commission and that the railroad company was a mere governmental department. We discover nothing in the evidence to justify the jury in finding, at least beyond a reasonable doubt, that Salas knew anything about these complicated relations, or that the United States was buying this tobacco through the railroad company. Indeed, Burke himself, who testified as a witness for the government, said that he considered himself to be an employé of the railroad company and not of the United States.

[4] We come now to consider the overt acts. As the indictment was filed March 15, 1915, only two of the Colon drafts which are relied on are within the statute of limitations. Exhibits 29 and 31 are as follows:

#### Government's Exhibit 29.

"Draft of International Banking Corporation No. 12/10127, dated Colon, R. P., May 15, 1912, for $2,500, directed to International Banking Corporation, 60 Wall street, New York City, to the order of Banque d'Hochelaga, marked on face, 'B 1/8' and 'R-48258' and 'no protest,' and perforated 'Paid 6—6—12,' Indorsed, 'S. M. White.' For identification only 'L. D. Smith.' Stamped, Banque d'Hochelaga, Winnipeg, May 20, 1912, [blank] Receiving Teller.' Stamped, 'Pay Banque d'Hochelaga, Montreal, or order. E. Belair, Acting Manager.' Stamped, 'Pay National Park Bank, New York, or order, prior indorsements guaranteed. Banque d'Hochelaga, F. G. Leduc, Manager.' Stamped, 'Received payment. National Park Bank of New York, June 6, 1912.'"

#### Government's Exhibit 31.

"Draft of Bank of Canal Zone, dated July 2, 1913, to the order of Fletcher Savings & Trust Company for $1,200, directed to Knauth, Nachod & Kuhne, New York, indorsed 'C/A John B. & Ida Burke,' indorsed by the Fletcher Savings & Trust Company and by the Fletcher American National Bank of Indianapolis, and stamped 'City Collection Department, paid July 12, 1913. National City Bank of New York,' and perforated 'Paid 7/12/13.'"

The theory of the government is that these drafts were given to effect the object of the conspiracy and being finally paid in New York constitute overt acts committed by Burke, one of the parties to the conspiracy, in the Southern district of New York, and so give jurisdiction to the court under section 42 of the Judicial Code which reads:

"Sec. 42. When any offense against the United States is begun in one judicial district and completed in another, it shall be deemed to have been committed in either, and may be dealt with, inquired of, tried, determined, and punished in either district, in the same manner as if it had been actually and wholly committed therein."

It may be admitted that payment of his share of the profits to Burke was an element of the conspiracy to defraud the United States, conceding that there was one, and that if made to him in New York City would have given the court jurisdiction. It seems to us, however, that in this division of profits between the three persons interested, no one of them owed anything to the others. Burke was not receiving the drafts on account of any debt. No one was owing or paying an obligation to the other but each was receiving his one-third of the profits. When, therefore, Burke accepted drafts in Colon payable in New York, he then and there received his share, and the conspiracy was not only conceived, but completed in the republic of Panama where it was contrary to no law.

To go one step further, and consider the disputed question whether a depositor who gets credit in his account for a draft deposited owns the draft or whether the bank owns it. The importance of this question is that, if the bank owned the two drafts in question, then Burke was paid when he got credit for them in Hochelaga and Indianapolis, respectively, and the final payment in New York was not to him, but to the banks. The trial judge held as matter of law that the drafts belonged to Burke when paid. Of course, if a draft be indorsed for collection, which used to be commonly the case, or if there be an understanding that the bank is to collect only, the depositor is the owner of the draft deposited and so remains until it is paid. If, however, the draft be given by the depositor in payment of an overdraft, as was the case with the Indianapolis draft for $1,200, obviously the bank becomes the owner. Or, if nothing whatever be said upon the subject, then as matter of law the bank is the owner of a draft for which the depositor is given credit. The Supreme Court considered this subject in Burton v. United States, 196 U. S. 283, 25 Sup. Ct. 243, 49 L. Ed. 482. There the defendant was indicted in St. Louis under Rev. Stat. U. S. § 1782, for the crime of receiving compensation for services rendered by him while a senator of the United States, in a proceeding before the Post Office Department. The check in question was for $500 drawn on a St. Louis bank and forwarded to the defendant in Washington who deposited it in his own bank there. The jurisdiction of the court depended upon the place where the defendant was paid, and Mr. Justice Peckham said:

"A careful scrutiny of the evidence with relation to this charge to the jury shows that there was no foundation for submitting to the jury the question of what was the understanding (other than such as arose from the transaction itself, as shown by uncontradicted evidence) between the defendant and the bank at the time when these various checks were deposited with the bank and their proceeds placed to the credit of the defendant. There was no agreement or understanding of any kind other than such as the law makes from the transaction detailed, which was itself proved by uncontradicted evidence offered by the government itself. In the absence of any special agreement that the effect of the transaction shall be otherwise (and none can be asserted here), there is no doubt that its legal effect is a change of ownership of the paper, and that the subsequent action of the bank in taking steps to obtain payment for itself of the paper which it had purchased can in no sense be said to be the action of an agent for its principal, but the act of an owner in regard to its own property. The learned judge in his charge to the jury did not, indeed, deny the general truth of this proposition, but he left it to the jury to deter-

mine whether there was not an agreement or understanding made or arrived at by the parties at the time the checks were taken by the defendant to the bank, which altered the legal effect of the transaction actually proved. This, as we have said, there was not the slightest evidence of, and it was error to submit that question to the jury."

There being no evidence of an agreement to the contrary, it follows that both these drafts when deposited, the first in the Hochelaga Bank in Canada and the second in the Fletcher Savings & Trust Company of Indianapolis, ceased to be Burke's and became the property of the banks, respectively, so that, if this indictment were properly found to be one to defraud the United States, still the payments in New York City were not payments to Burke, and cannot be treated as overt acts to effect the object of the conspiracy.

The judgment is reversed.

CHATFIELD, District Judge (dissenting). While agreeing with the propositions of law stated in the opinion of the majority of the court, I must dissent from the conclusion.

The evidence showed a conspiracy to divide profits which otherwise would have gone and should have gone to the United States, if Burke had done his duty. This was defrauding the United States, even though there was an intermediate party in the form of a corporation representing the United States as agent for the government business. Burke was also a government official and failed (through the effects of this conspiracy) to do his duty, even though the acts by which he directly carried out the conspiracy were done in Panama for the agent corporation and while he was a civil employé thereof.

The conspiracy as charged and proven was to get profits and to divide and send out of observation the share of each man. In so doing the use of drafts payable in the United States was contemplated, and if any of the conspirators actually carried out the division by using New York funds, so as to get his share of the spoils available in a New York bank, then jurisdiction could be laid in the Southern district of New York.

These questions were left to the jury, and I see no error of sufficient moment to reverse.