## In re EASTERN SHORE SHIPBUILDING CORPORATION.

## UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. WOOD.

(Circuit Court of Appeals, Second Circuit. June 15, 1921.)

No. 208.

Bankruptcy ⬅349—United States Shipping Board Emergency Fleet Corporation held not entitled to priority of payment.

The United States Shipping Board Emergency Fleet Corporation, incorporated under the general corporation law of the District of Columbia pursuant to Act Sept. 7, 1916, §§ 11, 13 (Comp. St. §§ 8146f, 8146g),

given the President's authority to construct, purchase, and requisition vessels under Act June 15, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115$^{1}$/$_{16}$d), by the President's executive order of July 11, 1917, was not entitled to priority of payment under Bankruptcy Act, § 64 (Comp. St. § 9648), and Rev. St. § 3466 (Comp. St. § 6372), of a debt due it from a bankrupt with whom the corporation made a contract as a principal, and not as the agent of the United States government, on the theory that the debt was one due to the United States, since the corporation having been organized as a private corporation under the District of Columbia's general incorporation law, the government's ownership of the stock did not divest it of its character as a private corporation, in view of sections 607, 608.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the Eastern Shore Shipbuilding Corporation, bankrupt. Petition of the United States Shipping Board Emergency Fleet Corporation, representing the United States, against Roger B. Wood, trustee in bankruptcy, for priority, denied, and petitioner appeals. Affirmed.

Francis G. Caffey, U. S. Atty., of New York City (Edward F. Unger, Asst. U. S. Atty., of New York City, and Henry J. Gibbons and Wm. Y. C. Anderson, both of Philadelphia, Pa., of counsel), for appellant.

Rosenberg, Ball & Marvin, of New York City (Godfrey Goldmark, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This case presents two questions of very considerable importance:

(1) Is the United States Shipping Board Emergency Fleet Corporation, organized under the laws of the District of Columbia for and on behalf of the United States in connection with the World War, such an agent of the United States that a debt due to it from the bankrupt is in fact and in law a debt due to the United States; and is the corporation as representing the United States entitled to claim whatever right of priority of payment the United States might be entitled to assert in the case of a debt owing to the government?

(2) If the court finds that the Fleet Corporation is such an agency, and may assert such rights to priority as the United States has, is the United States itself, under the Bankruptcy Act (Comp. St. §§ 9585–9656), entitled to the prior payment of ordinary debts due to it as against the general creditors of the bankrupt?

It may be said concerning the second question that there seems to be no authoritative decision determining whether or not the United States itself is entitled under the existing Bankruptcy Act to prior payment of debts due to it, as distinguished from unpaid taxes. This is rather remarkable, as the act has been in force since 1898. It will, of course, not be necessary for this court to consider the second of these questions, if we find that the Fleet Corporation is not such an agent of the United States that a debt due to it cannot be regarded as a debt due to the United States.

The first question which is here presented has received no consideration in any other case, at least in none which has come under our observation, or which has been brought to our attention. As contracts running into many millions of dollars have been entered into with the Fleet Corporation, and many of the contractors have been made bankrupt in attempting to perform them, and there are large sums due from them to the corporation, as well as to private creditors, the importance of the questions involved is readily appreciated.

It appears that on August 22, 1918, the United States Shipping Board Emergency Fleet Corporation entered into a contract with the Eastern Shore Shipbuilding Corporation, hereinafter referred to as the Eastern Shore Corporation, for the construction of six wooden harbor tugs for the United States. For each of these tugs the Eastern Shore Corporation was to receive $145,000, to be paid in ten installments as the work progressed. After the signing of the Armistice on November 11, 1918, the work under this contract was stopped, but was later resumed under supplemental agreements which it is not necessary to consider. In March, 1919, the Eastern Shore Corporation became involved in financial difficulties and receivers were appointed for it, and shortly thereafter, on March 20, 1919, it was adjudicated a bankrupt. At the time of adjudication none of the six tugs in course of construction was completed sufficiently to launch. The Eastern Shore Corporation had been paid by the Fleet Corporation under the contract on account $428,017.72. And after the adjudication of bankruptcy the Fleet Corporation was compelled to expend the additional sum of $135,161.65 in order to be able to launch the tugs and remove them from the bankrupt's shipyard. At the time of the bankruptcy the tugs were appraised at the sum of $100,000 and this was found to be their value by the referee in bankruptcy, who deducted that amount from the sum of $428,017.72, and allowed the balance of $328,017.72 as a general claim of the Fleet Corporation against the bankrupt's estate, but disallowed priority to said claim on the ground that the debt represented thereby is not a debt due to the United States. On petition to review the order of the referee, the District Judge affirmed it in all respects. On the appeal to this court no question is raised as to the amount due from the bankrupt. The only questions involved are those stated in the beginning of this opinion.

[1] The argument presented to us is that the Fleet Corporation, by virtue of its incorporation and organization under the acts of Congress and by virtue of an executive order of the President of the United States issued in pursuance of an act of Congress, was at the time of and in the transaction out of which this controversy grew, and still is, the appointee of the President of the United States, and the agent and representative of the United States, and that, the contract with the bankrupt having been made for and on behalf of the United States by the Fleet Corporation, as the appointee of the President and the agent and representative of the United States, the debt due thereunder is a debt due and owing to the United States, and therefore entitled

to priority of payment under the provisions of section 64 of the Bankruptcy Act (Comp. St. § 9648) and of section 3466 of the Revised Statutes (Comp. St. § 6372). The pertinent provisions of section 64 [1] and section 3466 [2] are found in the margin.

In determining the question of whether the Fleet Corporation is such an agency of the United States that a debt due to it is to be regarded as a debt due to the United States, it is necessary to examine the acts of Congress under which the Corporation came into existence. The Act of Congress of September 7, 1916, is entitled:

"An act to establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its territories and possessions and with foreign countries; to regulate carriers by water engaged in the foreign interstate commerce of the United States; and for other purposes." U. S. Stat. at Large, vol. 39, c. 451, p. 728.

The act created a board of five commissioners, to be appointed by the President. It authorized the board, with the approval of the President, to cause to be constructed and equipped, in American shipyards or elsewhere, or to purchase, lease, or charter, vessels suitable, as far as the commercial requirements of the marine trade of the United States may permit, for use as naval auxiliaries or army transports, or for other naval or military purposes, and also to charter, lease, or sell to any citizen of the United States any vessel so purchased or constructed. Section 11 of the act (Comp. St. § 8146f) provided for the formation of a Shipping Corporation, if found necessary. It reads as follows:

"That the board, if in its judgment such action is necessary to carry out the purposes of this act, may form under the laws of the District of Columbia one or more corporations for the purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States. The total capital stock thereof shall not exceed $50,000,-000. The board may, for and on behalf of the United States, subscribe to, purchase, and vote not less than a majority of the capital stock of any such corporation, and do all other things in regard thereto necessary to protect the

---

[1] Section 64 of the Bankruptcy Act reads as follows: .
"*Debts Which Have Priority.*—The court shall order the trustee to pay all taxes legally due and owing by the bankrupt to the United States, state, county, district, or municipality in advance of the payment of dividends to creditors, and upon filing the receipts of the proper public officers for such payment he shall be credited with the amount thereof, and in case any question arises as to the amount or legality of any such tax the same shall be heard and determined by the court; * * * and debts owing to any person who by the laws of the states or the United States is entitled to priority."

[2] Section 3466 of the Revised Statutes reads as follows:
"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

interests of the United States and to carry out the purposes of this act. The board, with the approval of the President, may sell any or all of the stock of the United States in such corporation, but at no time shall it be a minority stockholder therein: Provided, that no corporation in which the United States is a stockholder, formed under the authority of this section, shall engage in the operation of any vessel constructed, purchased, leased, chartered, or transferred under the authority of this act unless the board shall be unable, after a bona fide effort, to contract with any person a citizen of the United States for the purchase, lease, or charter of such vessel under such terms and conditions as may be prescribed by the board.   *   *   *

"At the expiration of five years from the conclusion of the present European War the operation of vessels on the part of any such corporation in which the United States is then a stockholder shall cease and the said corporation stand dissolved. The date of the conclusion of the war shall be declared by proclamation of the President. The vessels and other property of any such corporation shall revert to the board. The board may sell, lease, or charter such vessels as provided in section 7 and shall dispose of the property other than vessels on the best available terms, and, after payment of all debts and obligations, deposit the proceeds thereof in the treasury to its credit. All stock in such corporations owned by others than the United States at the time of dissolution shall be taken over by the board at a fair and reasonable value and paid for with funds to the credit of the board. In case of disagreement, such value shall be determined in the manner provided in section 10."

Section 13 of the act (Comp. St. § 8146g) provided for a bond issue not to exceed $50,000,000, to be used for the purpose of carrying out the provisions of the act. It contained the following among other provisions:

"The proceeds of such bonds and the net proceeds of all sales, charters, and leases of vessels and of sales of stock made by the board, and all other moneys received by it from any source, shall be covered into the treasury to the credit of the board, and are hereby permanently appropriated for the purpose of carrying out the provisions of sections 5 and 11."

On April 16, 1917, in pursuance of section 11 above quoted, the Fleet Corporation, appellant herein, was organized under the laws of the District of Columbia. The corporate purposes were stated as follows:

"First.—That the corporate name of the company shall be United States Shipping Board Emergency Fleet Corporation and the object for which it is formed is the purchase, construction, equipment, lease, charter, maintenance and operation of merchant vessels in the commerce of the United States and in general to do and to perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conducting of said business as authorized by the laws of Congress, and to have and to exercise all the powers conferred by the laws of the District of Columbia upon corporations under said subcharter four (4) of the incorporation laws of the District of Columbia."

On June 15, 1917, Congress conferred upon the President broad powers of control over contracts for the building, or purchase of ships or material. It authorized and empowered the President to exercise varied powers, and among them the power—

"e. To purchase, requisition, or take over the title to, or the possession of, for use or operation by the United States any ship now constructed or in the process of construction or hereafter constructed, or any part thereof, or charter of such ship."

274 F.—57

Another clause declared that—

"The President may exercise the power and authority hereby vested in him * * * through such agency or agencies as he shall determine from time to time: Provided, that all money turned over to the United States Shipping Board Emergency Fleet Corporation may be expended as other moneys of said corporation are now expended. All ships constructed, purchased, or requisitioned under authority herein, or heretofore or hereafter acquired by the United States, shall be managed, operated and disposed of as the President may .direct." Volume 40, Stat. at Large, c. 29, p. 182 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¹⁄₁₆d).

Under this authority the President made an executive order July 11, 1917, directing that the Fleet Corporation should have and exercise all power and authority vested in him by said provision, so far as applicable to the construction of vessels, the purchase or requisitioning of vessels in process of construction, and the completion thereof, and that the Shipping Board should exercise all power and authority vested in him by said provision, so far as applicable to the taking over of title or possession, by purchase or requisition, of constructed vessels or charters therein, and the operation, management, and disposition of such vessels, and of all others theretofore or thereafter acquired by the United States.

The Fleet Corporation's capital stock was fixed at $50,000,000. All of the stock, 500,000 shares, has been issued; the United States Shipping Board, for and on behalf of the United States, being the record holder of all the outstanding shares, except that the trustees of the company now are and always have had standing in their name as stockholders of record, 1 share of stock each, issued to them to qualify them as trustees. When any trustee resigned, the certificate of stock issued to him was indorsed and assigned to the United States Shipping Board and then was canceled, and a new share was issued to his successor. The certificates of stock issued to the Board certified on their face that the "United States Shipping Board on behalf of the United States is the registered owner of [the specified number] shares of the stock of this company." The Board held 499,993 shares; the remaining 7 shares being held by the seven trustees, each trustee holding 1 share.

From what has been said it appears that the Fleet Corporation was not created by a special act of Congress, but was formed pursuant to the general corporation law of the District of Columbia. Act March 3, 1901, U. S. Stat. at Large, vol. 31, c. 854, subc. 4, p. 1284. Section 607 of the act provides that a corporation organized under the act—

"shall be a body politic and corporate in fact and in name, * * * and be capable of suing and being sued in any court of law or equity in the District, and * * * be capable in law of purchasing, holding, and conveying any real or personal estate whatever which may be necessary to enable the company to carry on its operations."

Section 608 of the act declares that the stock, property, and concerns of a company incorporated under the act "shall be managed" by not less than 3 nor more than 15 trustees.

The business which the corporation was to be organized to carry on, as defined in the act of 1916, heretofore quoted in this opinion, was

"the purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States." This definition of its business was repeated in the act of 1917, also heretofore quoted. It is again repeated unchanged in its certificate of incorporation, and it was declared in the last-named act that it was to have power "in general to do and to perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conducting of said business as authorized by the laws of Congress, and to have and to exercise all the powers conferred by the laws of the District of Columbia upon corporations" organized under the provisions of the statute. This language is repeated also in the certificate of incorporation.

It thus appears that the business of the Fleet Corporation was not peculiarly governmental in its nature, but was commercial and industrial, and that its powers were not essentially different from those possessed by private corporations. We think that no provision can be found either in the acts of Congress or in the charter of the company giving to the corporation or its stockholders any rights, privileges, or obligations different from those possessed by any other corporation formed under the laws of the District of Columbia with respect to its business.

It is true that all the stock, except a few shares issued to qualify the members of the board of trustees, is owned by the United States. But we do not think that fact is of controlling significance, especially in view of the provision on that subject in section 11 of the Act of September 7, 1916. While it was provided that the United States Shipping Board might, for and on behalf of the United States, subscribe to and purchase the stock, it was also provided that the Board might, with the approval of the President, sell any or all of the stock of the United States in the corporation, subject to the restriction that the United States was at no time to be a minority stockholder. The fact that the United States owns stock in a corporation does not invest the corporation with the character of sovereignty, or invest it with the privileges and immunities of the sovereign. In United States Bank v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, the Supreme Court in 1824, had before it the case of a corporation in which the state of Georgia was a stockholder. A suit was brought in a United States court against the corporation. Chief Justice Marshall, speaking for the court, declared that the state did not, by becoming a corporator, identify itself with the corporation, and that the Planters' Bank of Georgia was not exempted from being sued in the federal courts by the circumstance that that state was a corporator. He said:

"It is, we think, a sound principle that, when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. * * * The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character,

so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation than are expressly given by the incorporating act.

"The government of the Union held shares in the old Bank of the United States; but the privileges of the government were not imparted by that circumstance to the bank. The United States was not a party to suits brought by or against the bank, in the sense of the Constitution. So with respect to the present bank. Suits brought by or against it are not understood to be brought by or against the United States. The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter. We think, then, that the Planters' Bank of Georgia is not exempted from being sued in the federal courts, by the circumstance that that state is a corporator."

In the above case the state of Georgia did not own all of the stock of the Planters' Bank, but that does not seem to us to be a material fact. In Salas v. United States, 234 Fed. 842, 148 C. C. A. 440, we had before us the question whether a conspiracy to defraud the Panama Railroad Company was a conspiracy to defraud the United States. We held that it was not, notwithstanding the fact that the United States owned the whole capital stock of the railroad company, and was solely interested in its profits or losses. We decided that—

"When the United States enters into commercial business, it abandons its sovereign capacity and is to be treated like any other corporation. * * * Although it absolutely owns the Panama Railroad Company and is the only person profiting or losing by its activities, still the railroad company sues and is sued just like any other corporation, in its own name."

See, also, Lord & Burnham Co. v. Fleet Corporation (D. C.) 265 Fed. 955, 957, where it was declared that—

"Ownership by the government of all of the stock of the corporation does not change the situation, and it remains a corporation just the same as though it had a dozen or more stockholders."

The decision of the Supreme Court in United States v. Strang, 254 U. S. 491, 41 Sup. Ct. 165, 65 L. Ed. ——, rendered on January 3, 1921, appears to us to lead logically to the conclusion we have reached upon the matter now under consideration. The Criminal Code (section 41 [Comp. St. § 10205]) makes it a criminal offense for an officer or agent of any corporation, joint-stock company, association, or firm to be employed or act as an officer or agent of the United States for the transaction of business with such corporation, joint-stock company, association, or firm. It appeared that Strang, while he was a member of a firm of ship outfitters, was at the same time employed by the Fleet Corporation as an inspector, and in that capacity signed and executed three separate orders to his firm for repairs and alterations on a steamship. He was tried on an indictment which charged him with a violation of the section of the Code above referred to. A demurrer to the indictment was sustained in the court below, and the Supreme Court affirmed. It was argued by the government that the Fleet Corporation was an agency or instrumentality of the United States, formed only as an arm for executing purely governmental powers and duties vested

by Congress in the President and by him delegated to it; that the acts of the Corporation were the acts of the United States; that therefore Strang in placing orders with his firm in behalf of the Fleet Corporation acted as an agent of the United States. The court in its opinion said:

"The Corporation was controlled and managed by its own officers and appointed its own servants and agents, who became directly responsible to it. Notwithstanding all its stock was owned by the United States, it must be regarded as a separate entity. Its inspectors were not appointed by the President, nor by any officer designated by Congress; they were subject to removal by the Corporation only and could contract only for it. In such circumstances we think they were not agents of the United States within the true intendment of section 41."

It also added:

"The view of Congress is further indicated by the provision in section 7, Appropriation Act of October 6, 1917 (40 Stat. 345, 384) * * *—'Provided that the United States Shipping Board Emergency Fleet Corporation shall be considered a government establishment for the purposes of this section.' Also, by the Act of October 23, 1918 (chapter 194, 40 Stat. 1015), * * * which amends section 35, Criminal Code, and renders it criminal to defraud or conspire to defraud a corporation in which the United States owns stock."

Congress by Act July 17, 1916, amended by Act Jan. 18, 1918, has provided for the creation of Federal Land Banks and Joint-Stock Land Banks. U. S. Stat. at Large, vol. 39, pt. 1, c. 245, p. 360 (Comp. St. §§ 9835a–9835z); U. S. Stat. at Large, vol. 40, c. 9, p. 431 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 9835w). Under section 5 of the act of 1916, it is provided that every Federal Land Bank shall have a subscribed capital of not less than $750,000. It is also provided that if, within 30 days after the opening of the subscription books, any part of the minimum capitalization of $750,000 shall remain unsubscribed, it shall be the duty of the Secretary of the Treasury to subscribe the balance thereof on behalf of the United States. It might be possible under this provision that the United States might hold none, or some, or all, of the stock of the Federal Land Bank. Is it possible that the question of whether these banks are to be regarded as private corporations or as a department of government, and as such invested with the attributes and privileges of the government of the United States, depends upon the number of shares of the capital stock the Secretary of the Treasury has subscribed for and holds on behalf of the United States? Can the answer be doubtful? And is it contingent upon whether the Secretary of the Treasury, acting under the authority which the act confers, has designated the bank as a depositary of public money and employed it as a financial agent of the government? The constitutionality of the legislation of Congress providing for the creation of these banks has recently been declared by the Supreme Court in Smith v. Kansas City Title & Trust Co., 255 U. S. ——, 41 Sup. Ct. 243, 65 L. Ed. ——, but the question whether banks so created are private corporations does not appear to have been raised.

Counsel for the appellant seem to attach importance to a statement made by the Supreme Court in The Lake Monroe, 250 U. S. 246, 254, 39 Sup. Ct. 460, 463 (63 L. Ed. 962), which reads as follows:

"The emergency shipping legislation [Act June 15, 1917] evidently was enacted in the expectation that the President would employ the Shipping Board and the Fleet Corporation as his agencies to exercise new powers, for the Fleet Corporation was mentioned in the act, and it was known to be but an arm of the Board."

But surely the fact that the Fleet Corporation was employed as an agency of the President does not of itself clothe the agency so employed with the immunities of his office. A bank organized under the National Bank Act and employed by the Secretary of the Treasury under the act as a depositary of public money and, to use the language of the act, as "a financial agent of the government" does not on that account lose its character as a private corporation, and does not become immune from suit.

It cannot be seriously contended, although the argument was addressed to us, that inasmuch as the Fleet Corporation was an agent of the government it could not be personally liable on its contracts, as agents are not personally liable on contracts made by them within the scope of their authority. We are told that a contract made in the name of a public agent will be construed to be a contract of the government, and not of the agent. Huffcut on Agency (2d Ed.) p. 254. This is to lose sight of the fact that the Fleet Corporation contracted as a principal in its contract with the bankrupt. It designated itself throughout the contract as owner, and was careful to distinguish between itself as owner and the United States, and the debt due from the bankrupt under the contract is a debt due to it as a principal, and not to the United States.

In the case under consideration, in causing to be created under the general incorporation law of the District of Columbia an industrial corporation with a capital stock divided into shares and managed by a board of trustees, the United States, by subscribing for the whole amount of the authorized capital stock in excess of what was needed to qualify the members of the board of trustees, did not confer upon the company the privileges and the prerogatives of its own sovereign character. It did not transform the corporation into a department of government, or divest it of its character as a private corporation. If Congress intended that this corporation should become a department of the government, instead of a separate legal entity, we are unable to discover why it should have resorted to such an indirect and extraordinary method of accomplishing its purpose. It follows, therefore, that a debt due to the United States Shipping Board Emergency Fleet Corporation from the bankrupt herein is not in law a debt due to the United States.

The conclusion above announced makes it unnecessary to consider the second question mentioned at the beginning of this opinion: Whether the United States, under the Bankruptcy Act, is entitled to the prior payment of ordinary debts due to it as against the general creditors of the bankrupt.

The order is affirmed.