[No. 29156. *En Banc.* August 11, 1944.]

SOUTHWEST WASHINGTON PRODUCTION CREDIT ASSOCIATION, *Respondent,* v. A. G. FENDER *et al., Appellants.*[1]

*Fred M. Bond,* for appellants Bloomer *et al.*

*James A. Stinson, Hull & Murray, Dana E. Brinck,* and *Henry R. Newton,* for respondent.

*The Attorney General* and *Rudolph Naccarato, Assistant, amici curiae.*

ROBINSON, J.—Respondent brought this action seeking foreclosure of a real estate mortgage and a chattel mortgage securing crop production loans made to defendants Fender. Appellants are holders of a mortgage on the same property, the lien of which was, by agreement, subordinated to the lien of respondent's mortgages.

The principal contention made by appellants is that the action should have been dismissed, as respondent did not allege or prove compliance with the provisions of Laws of

[1] Reported in 150 P. (2d) 983.

1937, chapter 70, p. 245, § 12, Rem. Rev. Stat. (Sup.), § 3836-12 [P. C. § 4656-62], requiring plaintiff corporations to allege and prove payment of state corporate license fees. The attorney general has filed a brief as *amicus curiae*, strongly supporting this contention.

Respondent is a corporation organized under the farm credit act of 1933 (12 U. S. C. A. § 1131 *et seq.*). The act provides for the establishment, in each of the twelve farm credit districts of the United States, of a production credit corporation, of which the directors of the local Federal land bank shall be ex-officio directors. All of the stock of these twelve corporations is owned by the United States government. The act also authorizes the governor of the farm credit administration to organize, and charter, "Production Credit Associations." These associations may be organized by ten or more farmers desiring to borrow money under the provisions of the act. By-laws may be adopted, but are subject to approval by the governor of the farm credit administration.

The stock of each such association is divided into two classes, Class A and Class B. Class A shares are subscribed for by the production credit corporation, and may be purchased by investors. Class B shares may be purchased only by borrowers and individuals entitled to become borrowers. Class B stock only is entitled to voting rights. Each holder of such stock is entitled to no more than one vote. Each holder of Class B stock, within two years after he ceases to be a borrower, must exchange his Class B stock for Class A stock, or may transfer it to another borrower or person eligible to become a borrower. All stock shares in dividend distributions without preference, but Class A stock is preferred as to assets on liquidation.

During the time the production credit corporation is a holder of any stock in the association, the appointment or election of directors, the secretary-treasurer, and the loan committee of the association is subject to approval by the president of the production credit corporation, and, during such time, any such director, secretary-treasurer, or other

officer of the association may, at any time, be removed by the president of the production credit corporation.

It is provided that each association shall, under the rules and regulations prescribed by the production credit corporation, with the approval of the governor of the farm credit administration, make loans to farmers for general agricultural purposes. Such loans must be made on such terms and conditions, at such rates of interest, and with such security as shall be prescribed by the production credit corporation. Borrowers are required to own, at the time the loan is made, Class B stock in an amount equal to five dollars per one hundred dollars of the amount of the loan.

The association may borrow from, and rediscount paper with, the Federal intermediate credit bank, and, except with the approval of the farm credit administration, may not borrow money or rediscount paper with any other bank or agency. Federal intermediate credit banks are authorized, subject to such restrictions, limitations, and conditions as may be imposed by the farm credit administration, to discount for, or purchase from, production credit associations, notes, bills of exchange, and other obligations presented by production credit associations, and to make loans to them secured by such collateral as may be approved by the governor of the farm credit administration.

They are also authorized, subject to the approval of the farm credit administration, to borrow money and to issue and sell collateral trust debentures and other similar obligations. All debentures issued by Federal intermediate credit banks are lawful investments and may be accepted as security for all fiduciary, trust, or public funds, the investment or deposit of which is under the authority or control of the United States or any officer or officers thereof. The capital stock of the intermediate credit banks is subscribed for by the secretary of the United States treasury.

The farm credit act of 1933 (12 U. S. C. A. § 1138c) provides that:

"The Central Bank for Cooperatives, and the Production Credit Corporations, *Production Credit Associations,* and Banks for Cooperatives, organized under this chapter, and their obligations, *shall be deemed to be instrumentalities of*

*the United States,* and as such, any and all notes, debentures, bonds and other such obligations issued by such banks, associations, or corporations shall be exempt both as to principal and interest from all taxation (except surtaxes, estate, inheritance, and gift taxes) now or hereafter imposed by the United States or by any State, Territorial, or local taxing authority. Such banks, associations, and corporations, their property, their franchises, capital, reserves, surplus, and other funds, and their income, shall be exempt from all taxation now or hereafter imposed by the United States or by any State, Territorial, or local taxing authority; except that any real property and any tangible personal property of such banks, associations, and corporations shall be subject to Federal, State, Territorial, and local taxation to the same extent as other similar property is taxed. The exemption provided herein shall not apply with respect to any Production Credit Association or its property or income after the stock held in it by the Production Credit Corporation has been retired, or with respect to the Central Bank for Cooperatives, or any Production Credit Corporation or Bank for Cooperatives, or its property or income after the stock held in it by the United States has been retired. (June 16, 1933, c. 98, § 63, 48 Stat. 267.)" (Italics ours.)

At the time of the institution of this suit, the issued and outstanding Class A stock of respondent amounted to $231,900, of which the Production Credit Corporation of Spokane was the owner and holder of stock amounting to $230,000, and the issued and outstanding Class B stock amounted to $29,853, all of which shares were held by borrowers from the institution. It is true that all funds of the Federal intermediate credit banks are funds obtained by sale of debenture bonds, and that none of such funds are funds of the United States government. However, the stock of the twelve production credit corporations, which organize the production credit associations and subscribe for their Class A stock, is owned by the United States.

"The capital stock of each Production Credit Corporation shall be in such amount as the governor determines is required for the purpose of meeting the credit needs of the district to be served by such corporation, and such amount may be increased or decreased from time to time by the governor in accordance with such credit needs. Such capital stock shall be divided into shares of $100 each. The ini-

tial capital stock of each such corporation shall be $7,500,000, which shall be subscribed for by the governor and held by him on behalf of the United States. . . ." 12 U. S. C. A. § 1131b.

■ To contend that this action should have been dismissed because the plaintiff did not allege and prove the payment of state corporate license fees is, of course, to admit that the plaintiff is a corporation. If so, it must be one organized and existing under and by virtue of the laws of the United States, hereinabove quoted in part. Is a production credit association an instrumentality of the United States? As we have already seen, such associations are expressly declared to be so in the statute itself. It is said:

"The Central Bank for Cooperatives, and the Production Credit Corporations, *Production Credit Associations,* and . . . shall be deemed to be instrumentalities of the United States, . . ." 12 U. S. C. A. § 1138c. (Italics ours.)

It was held, as early as 1819, in the celebrated case of *McCulloch v. Maryland,* 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579, that the states have no power to tax, impede, or control in any way the operation of laws constitutionally enacted by Congress to carry out the power vested in the national government. This proposition is so familiar that, when it was contended, in *First Nat. Bank of Tonasket v. Slagle,* 165 Wash. 435, 5 P. (2d) 1013, that the plaintiff national bank should have alleged and proved that it had paid its annual license fee, we said, in rejecting that contention and without deeming it necessary to cite sustaining authority:

"In any event, the legislature has no power to so limit corporations organized under Federal laws and exercising powers granted by the Federal government."

There is but one way in which the appellants can sustain the contention made, and that is by demonstrating that the act creating production credit associations is unconstitutional. Nowhere in either the brief of the appellants or in that of *amicus curiae* do we find any contention—at least a direct contention—supported by argument and citation,

that the act is unconstitutional. It is said, in the brief of *amicus curiae*:

"We are willing to grant that instrumentalities of the United States government, in their sovereign capacity, cannot be subjected to state laws, but it is our contention that when the United States steps down from its plane of sovereignty and enters the domain of business and commerce, such as operating merchant vessels by shipping boards, running railroads, going into the insurance business, or presumably making loans to private associations, it may well be granted that it has abandoned its sovereignty and submitted itself to the same laws as govern individuals engaged in that particular business. As stated in 61 A. L. R., on page 406:

" 'When the government abandons its sovereign capacity and seeks to avail itself of its legal rights as a body politic or artificial person, as fixed by local laws, its rights and remedies are the same as those of the individual.' "

The quotation is accurately made from page 406, 61 A. L. R., but, upon examination, it will be at once seen that it is merely an excerpt from that publication's digest of the contentions of the losing party in the case of *United States v. Miller*, 28 F. (2d) 846, 61 A. L. R. 405, in which the action was for the value of timber removed from government lands. It was held that the contention was inapplicable, since the government was exercising its sovereign power to protect the public domain, held in trust for the people of the United States.

In *Federal Land Bank v. Bismarck Lbr. Co.*, 314 U. S. 95, 102, 86 L. Ed. 65, 62 S. Ct. 1, it is said:

"The federal government is one of delegated powers, and from that it necessarily follows that any constitutional exercise of its delegated powers is governmental. *Graves v. New York ex rel. O'Keefe*, 306 U. S. 466, 477. *It also follows that, when Congress constitutionally creates a corporation through which the federal government lawfully acts, the activities of such corporation are governmental. Pittman v. Home Owners' Loan Corp.*, 308 U. S. 21, 32; *Graves v. New York ex rel. O'Keefe, supra*, 477." (Italics ours.)

Hence, the only constitutional question in this case, assuming that the appellants are in a position to raise it, is

whether or not the Federal government has the constitutional power to set up a farm credit system. That question is not discussed in the briefs of the appellants, or in that of *amicus curiae;* nor could any expression as to the existence or nonexistence of that power be wrung from counsel for the appellants by persistent questions from the bench during the oral argument. *If Congress had the constitutional power to create a farm credit system, that is the end of the matter.* If we should hold that it did not, on the ground suggested, to wit, that the loans provided for by the farm credit act to promote agriculture are but mere private commercial transactions, and that, in providing for them, the government steps down from its plane of sovereignty and enters the domain of ordinary commercial business, we would, by so holding, impliedly condemn as unconstitutional many classes of loans authorized by Congress in recent years, such as, for example, the vast loans made through the Reconstruction Finance Corporation to promote industry; for, obviously, there can be no distinction in nature and character between loans to promote industry and loans to promote agriculture.

It is, however, strongly insisted on behalf of appellants that the Southwest Washington Production Credit Association is a local corporation, competing in the same field with local credit corporations, and, therefore, subject to the taxing power of the state. But, if the Federal government has the power to furnish easy and convenient credit to farmers, it has the power to create agencies to carry that power into execution, and the only limitations on its power to create such agencies were long ago stated in the far-reaching opinion of the supreme court of the United States in *McCulloch v. Maryland,* 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579, decided in 1819. We quote from 4 Wheat., at page 421:

"But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which

are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

For current application of these principles, see *Pittman v. Home Owners' Loan Corp.,* 308 U. S. 21, 84 L. Ed. 11, 60 S. Ct. 15, 124 A. L. R. 1263.

We again quote from *McCulloch v. Maryland,* 4 Wheat., at page 409:

"The government which has a right to do an act, and has imposed on it, the duty of performing that act, must, according to the dictates of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception."

The appellants have not met that burden. They have not shown that the production credit corporations are not adapted to the end sought, or that they are in any way prohibited. At the most, they have merely insisted that the farm credit act permits local citizens to create a corporation to compete with local corporations in the same business. But this is inexact. It is the Federal government which created the production credit corporations for the purpose of carrying out a Federal object. The fact that it, in part, used local persons in organizing its agents and instrumentalities is, from a legal point of view, wholly immaterial. From a policy standpoint, we might well sympathize with the position taken by the appellants; but the question as to whether or not the means selected to carry out the governmental power are the wisest that could have been adopted is wholly legislative.

We repeat that we think that the exercise of the Federal power does not become converted into a local activity because local citizens are made use of in exercising it. They are citizens, or at least residents, of the United States, as well as the state. Besides, this point has, in effect, been repeatedly decided. Farm loan associations are also organized by ten or more local persons. As we read the statutes involved, farm loan associations bear substantially the same

relationship to the farm loan banks as production credit associations bear to the production credit corporations.

Farm loan associations were provided for in an act passed by Congress in 1916. Upon an examination of this legislation, 12 U. S. C. A. §§ 711-745 (see, particularly, §§ 716, 717-721, 723, and 731 *et seq.*), it is at once apparent that, in providing production credit associations in 1933, Congress followed the same general plan that had been used in setting up the farm loan associations seventeen years before. Both farm loan associations and production credit associations were created by Congress for the same general purpose; that is, to afford credit to agricultural producers. If the farm loan association is a constitutional Federal instrumentality, the production credit association is also, and not merely the farm loan banks, but also the farm loan associations, have been repeatedly held lawful instrumentalities of the Federal government. A few citations should suffice. See *Smith v. Kansas City Title & Trust Co.*, 255 U. S. 180, 65 L. Ed. 577, 41 S. Ct. 243; *Federal Land Bank v. Crosland*, 261 U. S. 374, 67 L. Ed. 703, 43 S. Ct. 385, 29 A. L. R. 1; *Federal Land Bank v. Gaines*, 290 U. S. 247, 78 L. Ed. 298, 54 S. Ct. 168; *Federal Land Bank v. Priddy*, 295 U. S. 229, 79 L. Ed. 1408, 55 S. Ct. 705; *Knox Nat. Farm Loan Ass'n v. Phillips*, 300 U. S. 194, 202, 81 L. Ed. 599, 57 S. Ct. 418, 108 A. L. R. 738; *Federal Land Bank v. Bismarck Lbr. Co., supra.*

Moreover, it has been held, by the only court that as far as we know has had the question directly before it, that a production credit association is a Federal agency, and, as such, entitled to the rights, privileges, and immunities thereof. *Hartford Production Credit Ass'n v. Clark*, 118 Conn. 341, 172 Atl. 266. Speaking of such an association as the respondent, that court said:

"It is, and could be, created only under the Federal Act and is expressly declared therein to be an instrumentality of the United States; its operations are supervised and regulated in all material respects by other federal agencies and by federal officials, and the funds with which it may make loans are derived from federal sources and obtained through other instrumentalities of the United States."

We have ourselves held that farm loan banks are constitutional instrumentalities of the Federal government. *Federal Land Bank of Spokane v. Statelen*, 191 Wash. 155, 70 P. (2d) 1053, and we agree with the Connecticut court that a production credit association, such as the respondent, is such an instrumentality. Its franchise is, by the express provisions of the farm credit act, exempt from state taxation and all state tax burdens other than as to its real property and tangible personal property, so long as any of its stock is held by the production credit corporation. 12 U. S. C. A. § 1138c. One of the facts in this case is that, at the time of the institution of this suit, the production credit corporation owned $230,000 of the $231,900 of Class A stock of the respondent issued and outstanding. It, therefore, follows that the respondent was not required, as appellants contend, to allege and prove the payment of state corporate license fees. It was exempt from that by the provisions of the statute under which it was created.

Appellants further contend that the action should have been dismissed on the ground that the respondent did not show that it was authorized to bring the suit. The evidence shows that the notes representing the loans were discounted by respondent with the Federal Intermediate Credit Bank of Spokane, but were thereafter reassigned to respondent, and belonged to respondent. The complaint was verified by the secretary-treasurer of respondent, and officers of respondent testified at the trial on its behalf. There was sufficient showing that respondent was authorized to institute the suit. *Pacific Sav. & Loan Ass'n v. Corbett*, 155 Wash. 45, 283 Pac. 479.

Some contention is made that the judgment was excessive in amount. Appellants do not contend that the judgment was for more than the amount due from the Fenders, but appear to contend that the money was not disbursed in the manner directed by the subordination agreement. Appellants, in their brief, merely state that:

"The cost for picking the crop amounted to the sum of $1100.00 and that the entire crop picked after it was sold to only $1658.56. In other words the cost of picking this crop

was nearly the entire cost of the sale of it. We submit from the foregoing facts that the moneys were not used for the benefit of and for said purpose as mentioned in the subrogation agreement but were dissipated and in fact was a constructive fraud upon these appellants."

There is no evidence whatever in the record that the cost of picking was excessive. The relatively high cost of picking may be, for aught that is shown, the necessary consequence of a thin crop. We have examined the oral evidence and the very complete documentary evidence pertinent to this final contention, and all things appear to have been done in strict pursuance of the subordination agreement. We find no merit in the contention.

The judgment of the trial court is affirmed.

BEALS, BLAKE, JEFFERS, MALLERY, and GRADY, JJ., concur.

MILLARD, J. (dissenting)—In cases of conscientious difference of opinion on fundamental principles, the dissent is "a duty which the dissentient owes to the majesty of the law itself, its votaries and himself" (13 Va. Law Reg. (N. S.) 60), but there should be no attempt to bolster the dissenting opinion with citations of repealed statutes and quotations from utterances the authorship of which is erroneously attributed to some eminent character of American history.

In his first inaugural address, President Lincoln said:

"I take the official oath today with no mental reservations and with no purpose to construe the Constitution by any hypercritical rules. . . . You [speaking of those of and in sympathy with the Southern Confederacy] can have no oath registered in Heaven to destroy the Government; while I shall have the utmost solemn one to 'preserve, protect and defend' it."

June 23, 1944, a prominent national politician intimated the possibility and/or probability of bloodshed if hostility to a certain so-called philosophy of government continued.

The conditions of which Dr. Nicholas Murray Butler spoke July 6, 1909, in an address, "The Call to Citizenship," before the National Education Association at Denver, Colorado, still obtain. He said:

"There are those among us, some of them in places of responsibility and great influence, who call these principles [fundamental principles of Anglo-Saxon institutions] outworn, antiquated, obstacles to popular government, and who would substitute the passing desire of today for the carefully wrought design of all time. . . . The courts are attacked as usurpers of an authority which the people themselves have given them for the people's own protection. The carefully built guards which have been put about individual rights and liberties are denounced as fortresses of privilege by those who seek privileges for themselves at the expense of the rights of others."

I, as well as President Lincoln, took, with no mental reservations, the official oath to support the constitution of the United States—to defend my government against all enemies, domestic as well as foreign. Those who threaten revolution if we do not sustain unconstitutional enactments, the purpose of which is to destroy the carefully built guards which have been put about individual rights and liberties, "can have no oath registered in Heaven to destroy the government; while I shall have the utmost solemn one" to defend it against all enemies, domestic and foreign.

Even if all the shares of stock of a corporation authorized by and created pursuant to an act of Congress were owned by the United States, such corporation would be none the less a private corporation, a distinct entity which, in engaging in commercial ventures and transacting the business for which it was organized, would be subject to the laws of the states of this Union in which that corporation sought to do business. The mere declaration in the Congressional enactment that the corporation thus created was a Federal agency and as such entitled to the rights, privileges, and immunities of a Federal agency would not be binding upon the sovereign states of this Union if, in fact, the United States was not functioning within the restricted governmental field for which it was created by the states.

It is high time that the sovereign states of these United States challenge the right of the Federal government to lay aside its sovereignty and engage in commercial ventures. The Southwest Washington Production Credit As-

sociation of Chehalis is not an agency of the United States government; it is, as contended in the brief of *amicus curiae,* an organization which came into existence by the associating together of a group of men within a certain district and the agreement of those men to sign articles of incorporation. No one in that association holds its money for the benefit of the United States government and none of the governmental agencies or instrumentalities who may deal with this association has any voice in the conduct of the affairs of the association. All of the officers of the association are elected by members of the association and their compensation is fixed by the board of directors of the association and they are elected annually. · The association functions nowhere other than in the particular southwest district wherein it is organized. The United States is not a necessary nor a proper party to the action.

In the original departmental opinion was the assertion that "we think there is not the slightest probability that the supreme court of the United States, which will have the last word in the matter, will hold that the law providing for their creation is unconstitutional."

That is to say, the majority is of the view that the supreme court of the United States will hold that the Federal government may lay aside its sovereignty, engage in private business, and then, functioning as a private corporation, invoke the privileges and immunities inherent in sovereignty. ·

I cannot so confidently predict the future course of the United States supreme court. That it has recently disregarded the ancient landmarks is forcefully called to our attention by the dissenting opinion of Mr. Justice Roberts in *Mahnich v. Southern S. S. Co.,* 321 U. S. 96, 64 S. Ct. 455:

"The evil resulting from overruling earlier considered decisions must be evident. In the present case, the court below naturally felt bound to follow and apply the law as clearly announced by this court. If litigants and lower federal courts are not to do so, the law becomes not a chart to govern conduct but a game of chance; instead of settling rights and liabilities it unsettles them. Counsel and parties will bring and prosecute actions in the teeth of the decisions

that such actions are not maintainable on the not improbable chance that the asserted rule will be thrown overboard. Defendants will not know whether to litigate or to settle for they will have no assurance that a declared rule will be followed. But the more deplorable consequence will inevitably be that the administration of justice will fall into disrepute. Respect for tribunals must fall when the bar and the public come to understand that nothing that has been said in prior adjudication has force in a current controversy.

"Of course the law may grow to meet changing conditions. I do not advocate slavish adherence to authority where new conditions require new rules of conduct. But this is not such a case. The tendency to disregard precedents in the decision of cases like the present has become so strong in this court of late as, in my view, to shake confidence in the consistency of decision and leave the courts below on an uncharted sea of doubt and difficulty without any confidence that what was said yesterday will hold good tomorrow, unless indeed a modern instance grows into a custom of members of this court to make public announcement of a change of views and to indicate that they will change their votes on the same question when another case comes before the court. This might, to some extent, obviate the predicament in which the lower courts, the bar, and the public find themselves."

Also pertinent is the following language from dissenting opinion of Mr. Justice Roberts in *Smith v. Allwright*, 321 U. S. 649, 64 S. Ct. 757 (decided April 3, 1944), which overruled *Grovey v. Townsend*, 295 U. S. 45, 79 L. Ed. 1292, 55 S. Ct. 622:

"I believe it will not be gainsaid the case [*Grovey v. Townsend*] received the attention and consideration which the questions involved demanded and the opinion represented the views of all the justices. It appears that those views do not now commend themselves to the court. I shall not restate them. They are exposed in the opinion and must stand or fall on their merits. Their soundness, however, is not a matter which presently concerns me.

"The reason for my concern is that *the instant decision,* overruling that announced about nine years ago, *tends to bring adjudications of this tribunal into the same class as a restricted railroad ticket, good for this day and train only. I have no assurance, in view of current decisions, that the*

*opinion announced today may not shortly be repudiated and overruled by justices who deem they have new light on the subject.* In the present term the court has overruled three cases.

"If this court's opinion in the *Classic* case discloses its method of overruling earlier decisions [answering suggestion that *Grovey v. Townsend* was overruled *sub silentio* in *United States v. Classic*, 313 U. S. 299], I can only protest that, in fairness, it should rather have adopted the open and frank way of saying what it was doing than, after the event, characterize its past action as overruling *Grovey v. Townsend* though those less sapient never realized the fact.

*"It is regrettable that* in an era marked by doubt and confusion, an era whose greatest need is steadfastness of thought and purpose, *this court,* which has been looked to as exhibiting consistency in adjudication, and a steadiness which would hold the balance even in the face of temporary ebbs and flows of opinion, *should* now itself *become the breeder of fresh doubt and confusion in the public mind as to the stability of our institutions."* (Italics mine.)

June 5, 1944, in *United States v. South-Eastern Underwriters Ass'n,* 322 U. S. 533, 64 S. Ct. 1162, four justices of the United States supreme court (three justices dissented and two justices did not participate) repudiated the prior opinions of the United States supreme court which for seventy-five years held that the commerce clause of the constitution does not deprive the individual states of power to regulate and tax specific activities of foreign insurance companies which sell policies within their territories.

In the Seattle Daily Times, June 30, 1944, is the following item:

"The Supreme Court of the United States has 'rendered it impossible for the practicing lawyer to advise his client as to what the law is today, or even to offer a guess as to what it will be tomorrow,' a resolution adopted by the State Bar of Texas declares.

"The court 'repeatedly has overruled decisions, precedents and landmarks of the law of long standing without assigning any valid reason therefor,' read the resolution adopted yesterday, 'dismissing the question with a wave of the hand, and contenting itself with the assertion that these precedents have been eroded by the processes of the years;

or basing its decision on casuistry and sophistry rather than by logic.'

"The resolution added that 'by this conduct and controversies within its own personnel, it (the court) has subjected itself to the suspicion, widely held, that it speaks, or undertakes to speak, in the voice of the appointing power, rather than the voice of the law.'

"Presented by J. W. Hassell of Dallas, the resolution asserted that 'the Supreme Court of the United States is losing, if it has not already lost, the high esteem in which it has been held by the people.' "

In some of our metropolitan newspapers there appeared about forty years ago a humorous article, authorship of which was ascribed to a "Mr. Dooley," entitled "The Supreme Court follows the election returns."

In a book written in 1941 by a present member of the United States supreme court is a vigorous denunciation of that court's alleged attempted nullification of the New Deal. See book note, 27 Va. Law Rev. 980. The author states that blocking the way of those who seek to break the fetters of a clutching past stand nine old men in black who stage a bitter last fight in their effort to enshrine the crumbling doctrine of *laissez-faire* in constitutional raiment. He gives (in line with Mr. Dooley's statement that "The Supreme Court follows the election returns") as explanation why the supreme court packing bill was defeated that

"As soon as the Court began to show contrition and to do penance for its sins, sentiment grew for forgiveness."

In *Hole v. Rittenhouse* (see 2 Phila. 411, 417) Justice Jeremiah S. Black, who died August 19, 1883, in his seventy-fourth year, delivered the majority opinion on the first appeal of the case. When it came up on the second appeal, two of the justices subscribing to his views had died and another had changed his mind. As a consequence, Justice Black found himself in the minority. In his dissenting opinion ("the classic philippic among dissenting opinions," as stated by John R. McCreight of the Pennsylvania bar), Justice Black scathingly condemns, as follows, a court's repudiation of long-established rules because of a change of personnel of the court:

"When a principle of law is established by a long series of decisions without a single case on the other side; to carry it out in plain good faith, is as sacred a duty as any Judge has to perform. His own notion that it ought to be otherwise is not entitled to a moment's consideration. It is no part of our office to tinker at the law, and patch it up with new materials of our own making. Suitors are entitled to it just as it is. Bad laws can be borne; but the *jus vagum aut incertum*—the law that shifts and changes every time it passes through the Courts is as sore an evil and as heavy a curse as any people can suffer; and no people who are fit for self-government will suffer it long. Even a legislator, if he is wise and thoughtful, will make no change which is not absolutely necessary. Legislative changes however are prospective, and disturb nothing that is past. But Judge-made laws sweep away all the rights which may have been acquired on the faith of previous rules. For such wrongs even the legislature can furnish no redress. When the scales of justice are shaken by the hands that hold them here, there is no power elsewhere to adjust them. A simple man who has invested his money in the purchase of a title solemnly pronounced indefeasible in half a dozen cases decided by the highest tribunal of the State, may wake up from his dream of security to find himself ruined by a contrary ruling of the very same question.

"The judgment now about to be given, is one of 'death's doings.' No one can doubt that if Judge Gibson and Judge Coulter had lived, the plaintiff could not have been thus deprived of his property; and thousands of other men would have been saved from the imminent danger to which they are now exposed of losing the homes they have labored and paid for. But they are dead; and the law which should have protected those sacred rights has died with them. It is a melancholy reflection, that the property of a citizen should be held by a tenure so frail. But 'new lords, new laws' is the order of the day. Hereafter if any man be offered a title which the Supreme Court has decided to be good, let him not buy if the Judges who made the decision are dead; if they are living let him get an insurance on their lives; for ye know not what a day or an hour may bring forth.

"The majority of this Court changes on the average once every nine years, without counting the chances of death and resignation. If each new set of Judges shall consider themselves at liberty to overthrow the doctrines of their predecessors, our system of jurisprudence (if system it can

be called) would be the most fickle, uncertain and vicious that the civilized world ever saw. A French constitution, or a South American republic, or a Mexican administration would be an immortal thing in comparison to the short-lived principles of Pennsylvania law. The rules of property which ought to be as steadfast as the hills, will become as unstable as the waves. To avoid this great calamity, I know of no resource but that of *stare decisis*. I claim nothing for the great men who have gone before us on the score of their marked and manifest superiority. But I would stand by their decisions, because they have passed into the law and become a part of it—have been relied and acted on—and rights have grown up under them which it is unjust and cruel to take away."

Some may conclude that we merit the same criticism (see *State v. McCollum,* 17 Wn. (2d) 85, 136 P. (2d) 165, and other cases now before us, opinions in which may be filed this year).

I do not agree with the statement in the majority opinion that the Congressional declaration that production credit associations are instrumentalities of the United States forecloses the question whether respondent credit association is a Federal instrumentality. It will hardly be argued that, when the legislature of Washington creates credit associations or co-operative companies, such creations are instrumentalities, agencies, or departments of this state, or that legislative declaration that they were state agencies would be conclusive.

The majority opinion states:

"Nowhere in either the brief of the appellants or in that of *amicus curiae* do we find any contention—at least a direct contention—supported by argument and citation, that the act is unconstitutional. It is said, in the brief of *amicus curiae:*

" 'We are willing to grant that the instrumentalities of the United States government, in their sovereign capacity, cannot be subjected to state laws, but it is our contention that when the United States steps down from its plane of sovereignty and enters the domain of business and commerce, such as operating merchant vessels by shipping boards, running railroads, going into the insurance business, or presumably making loans to private associations, it may

well be granted that it has abandoned its sovereignty and submitted itself to the same laws as govern individuals engaged in that particular business. As stated in 61 A. L. R., on page 406:

"' "When the government abandons its sovereign capacity and seeks to avail itself of its legal rights as a body politic or artificial person, as fixed by local laws, its rights and remedies are the same as those of the individual." '

"The quotation is accurately made from page 406, 61 A. L. R., but, upon examination, it will be at once seen that it is merely an excerpt from that publication's digest of the contentions of the losing party in the case of *United States v. Miller*, 28 F. (2d) 846, 61 A. L. R. 405, in which the action was for the value of timber removed from government lands. It was held that the contention was inapplicable, since the government was exercising its sovereign power to protect the public domain, held in trust for the people of the United States."

Implicit in the foregoing is the criticism that counsel for *amicus curiae* and counsel for appellants did not cite "authorities" but merely quoted argument of counsel for defendant in error in *United States v. Miller*, 28 F. (2d) 846, 61 A. L. R. 405. It is not inapt to observe that while we are examining into everything we sometimes find truth, which is unadorned and always simple, where we least expect it.

In *United States v. Miller*, 28 F. (2d) 846, 61 A. L. R. 405 (United States circuit court of appeals, 8th circuit), it was held that the Federal government may recover the value of timber removed from public land and sold to another by one who had never perfected a homestead entry on such land; that the United States, in asserting governmental rights vested in it as a sovereign, is not bound by a state statute of limitations, unless by act of Congress the United States assented thereto. Whether Congress may waive, delegate, or surrender, in whole or in part, sovereignty of the United States is questionable.

In the course of its opinion, the United States circuit court said:

"Can the government of the United States, under the facts disclosed by the petition, recover, unhampered by statutes of limitation of a state, for timber unlawfully taken

from the public domain? While the government of the United States is one of delegated and limited power, and the rights not granted to the government are reserved to the states, yet within the sphere of that delegated power the government of the United States is clothed with all attributes of sovereignty, except as limited by the Constitution. It is supreme in the exercise thereof, and cannot be hampered, impeded, or defeated by state legislation. In the noted case of *McCulloch v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579, Chief Justice Marshall, the most profound interpreter of the Constitution this country has ever known, pointed out that the people in forming this government had no intention of making the national government dependent on the states. While embarrassing and grave difficulties have arisen as a result of our dual system of government, it is happily true, as once said by that same great Justice, referring to the federal government: 'Its powers are unquestionably limited; but while within those limits, it is a perfect government as any other, having all the faculties and properties belonging to a government, with a perfect right to use them freely, in order to accomplish the object of its institution.'

"So it is that the United States, in asserting governmental rights vested in it as a sovereign, is not bound by statutes of limitation of a state, unless the Congress has clearly manifested that intention. In *Davis v. Corona Coal Co.,* 265 U. S. 219, 222, 68 L. Ed. 987, 988, 44 S. Ct. 552, 553, it is said: 'Also it is established that a state statute of limitations cannot bar the United States, at least when a suit is brought in the United States courts.' In *Chesapeake & Del. Canal Co. v. United States,* 250 U. S. 123, 125, 63 L. Ed. 889, 891, 39 S. Ct. 407, 408: 'It is settled beyond controversy that the United States, when asserting "sovereign" or governmental rights, is not subject to either state statutes of limitation or to laches.' " *United States v. Miller,* 28 F. (2d) 846, 61 A. L. R. 405.

A more careful examination of the opinion of the United States circuit court, particularly the following observation respecting the argument which the majority opinion in the case at bar criticises counsel for invoking as an "authority," would have obviated the criticism:

"A different situation as to the applicability of statutes of limitation is presented when the government is merely a nominal party, bringing action for the benefit of a third

party, *United States v. Fletcher*, 155 C. C. A. 406, 242 Fed. 818; *Curtner v. United States*, 149 U. S. 662, 37 L. Ed. 890, 13 S. Ct. 985; *United States v. New Orleans Pac. Ry. Co.* 248 U. S. 507, 63 L. Ed. 388, 39 S. Ct. 175; or when the United States steps down from its plane of sovereignty and enters the domain of business and commerce, such as operating merchant vessels by a Shipping Board, or running railroads, or going into the insurance business. When this is done, it may well be claimed that it has abandoned its sovereignty and submitted itself to the same laws that govern individuals engaged in that business. *Gould Coupler Co. v. United States Shipping Bd. Emergency Fleet Corp.* (D. C.) 261 Fed. 716; *The No. 34* (D. C.) 11 F. (2d) 287; *The Falcon* (D. C.) 19 F. (2d) 1009; *Standard Oil Co. v. United States*, 267 U. S. 76, 69 L. Ed. 519, 45 S. Ct. 211." *United States v. Miller, supra.*

Zeal of counsel and industry of a court's law clerks may bring to light much printed matter, some of which may be cited by counsel in his brief or by the court in its opinion if such material tends to buttress the position of counsel or support the decision of the court. All of the citations by bench and bar may not accurately be entitled "authority."

Lexicographers define authorities as "judicial decisions, official opinions, or the writings of jurists of recognized ability." In 1941 edition of Funk & Wagnall's dictionary we find that "an *authority* in any department of thought is one who has had special opportunities of acquaintance with that department, has shown special ability and mastery in it, and is free from prejudices."

In the light of the foregoing definition, the criticism of counsel in the case at bar for citing argument of counsel in *United States v. Miller, supra,* is unfortunate. Would we deem the writing an *authority* if its author was an appointee committed by the appointing power to some false philosophy? Would the utterances of the holder of an elective office be entitled to acceptance if the statements of that official were governed by his fears of a part or all of the electorate? David Dudley Field, a famous law reformer and eminent advocate, who died in 1894 in his ninetieth year, in addressing himself to the subject of a

lawyer's duty said, which is as applicable to the bench as to the bar:

"Those who were sycophants and cowards before kings in past days would have been sycophants and cowards before the people in ours. They who feared to defend one whom the crown hated would be afraid now to defend one whom the multitude pursued. It is only the object of the flattery or the fear that has changed. Then it was the power above them; now it is the power around them,—but power in both cases all the same."

To be authoritative, the opinion or assertion must be *entitled* to acceptance. Recently there was imputed to one of our prominent Federal officials the statement that continued hostility to the program of a certain so-called philosophy of government, which means a change of form of our government, would result in bloodshed. That utterance may be cited as an authority; that is, an argument *ad baculum*—proves a conclusion by an appeal to force, rather than reason. In the year 711 A. D., the Moslem hordes overran Europe, first defeating the Visigoths in Spain. Those followers of Mahomet entered Europe with the Koran in one hand and a scimitar in the other. You had the option of giving at least lip service to the religion of those invaders or being liquidated. The offer of the Federal official on behalf of the domestic enemy parallels the right of choice tendered the Europeans by their foreign enemy. Today we have, also, the *argumentum ad populum:* An argument appealing to the prejudice of the hour rather than to intelligence.

Apropos of the foregoing: Mr. Asquith, ex-premier of Great Britain, said in an address to the American Bar Association on the occasion of its visit to England in 1925:

"There is no profession either on this or the other side of the Atlantic which has done more, in the way both of effort and of sacrifice, to maintain the supremacy of law over force, to preserve the safeguards of liberty against any form of invasion, whether from the autocracy of a sovereign or from the oligarchy of a class, or from the seductions and threats of a crowd."

It behooves us of the legal profession to discontinue

boasting of our past contributions to preserve the constitution, and awaken from our lethargy, realizing that only by eternal vigilance and further effort to save our constitutional form of government may the safeguards of liberty be preserved for ourselves and those who follow us.

In the last paragraph of the opinion in *United States v. Miller, supra,* is at least an intimation that, if the suit had been one merely to enforce a private right on the part of the Federal government holding property as other persons, and not one brought by the government in pursuance of the trust reposed in it as a sovereign to preserve and protect the public domain for the people of the United States—that is, a right asserted solely in the public interest; hence, an attribute of governmental sovereignty—the state statute of limitations would have barred recovery by the Federal government.

In 1791, on the recommendation of Alexander Hamilton, secretary of the treasury, the bank of the United States was established. In 1818, the legislature of Maryland imposed a stamp duty on the circulating notes of all banks and branches thereof located in that state, not chartered by the legislature. A branch of the bank of the United States established in Baltimore refused to pay the tax, whereupon the state instituted an action against McCulloch, cashier of the Maryland branch bank, to recover the tax. Judgment rendered against him in the state court was reversed and the action dismissed on appeal to the United States supreme court (*McCulloch v. Maryland,* 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579) on the ground that the states did not have power to tax an agency of the Federal government.

Chief Justice Marshall, speaking for the court, followed the opinion written in 1791 by Alexander Hamilton (which was contrary to the opinions submitted to the president by the secretary of state and the attorney general) on the constitutionality of an act providing for the incorporation of a national bank, as an instrument of great utility in the operations connected with the support of public credit. An examination of Mr. Hamilton's opinion will not disclose that he was of the view that the power of engaging in pri-

vate business was a function of government. To make the standard of the exercise of any implied power a case of expediency or necessity, he deemed, it is clear from a reading of his opinion, a subterfuge to justify transcending the bounds of constitutional authority.

While Chief Justice Marshall stated that the Federal government had the power to create a corporation as an instrument in the operations connected with the support of the government, and that the states have no power, by taxation or otherwise, to impede or in any manner control the operations of *constitutional laws* enacted by Congress to carry into execution the powers vested in the Federal government, nowhere in the opinion is there a statement, or language from which it may reasonably be inferred, that the power of creating a corporation may constitutionally be extended to effect the purpose of placing the Federal government in private business enterprises. The power of going into private business of lending money, selling dry goods, groceries, etc., is not one of the express or implied powers vested in the Federal government. Summarized, the United States supreme court, speaking through Chief Justice Marshall, held that a state statute imposing a tax on the operation of an instrument employed by the Federal government to carry its powers into execution, is unconstitutional. Respondent is not such an instrument.

I note the following statement in the majority opinion, and recall that the time of appellants was exhausted in the debate between counsel and the court:

" . . . nor could any expression as to the existence or nonexistence of that power [power of Federal government to set up a farm credit system] be wrung from counsel for the appellants by persistent questions from the bench during the oral argument."

Heat is often engendered by the court's debate with counsel, but infrequently is light received therefrom. For some years we have, presumptively, devoted our time and study to grasping and comprehending legal questions. (See "Law Notes," November 1924, p. 144, comment on Atlantic Monthly article.) Doubtless, counsel relied upon that pre-

sumption and modestly deemed himself too lacking in forensic experience to debate successfully the question with the court. With the conviction that the learning and ability of this court would safeguard the interest of his clients, counsel proceeded to the limit of his ability to present to this court that which he thought sustained the position of his clients. It is true, as the majority opinion states, that counsel for appellants quoted from argument of certain counsel in *United States v. Miller, supra.* For that, counsel should not be reproved, as that argument is entitled to acceptance as authority and it has received judicial sanction. In the opinion of the United States circuit court in that case, the court approved the argument quoted by counsel for appellants in the case at bar, as will be disclosed by reading quotation above from the opinion in *United States v. Miller, supra.*

In *United States Grain Corp. v. Phillips*, 261 U. S. 106, 67 L. Ed. 552, 43 S. Ct. 283, the supreme court of the United States held that the right of a naval officer to a percentage on gold received on board and carried as freight, upon his responsibility, did not attach to gold held and shipped by the United States grain corporation, as an agency of the United States, and that obligation to carry which, upon the same terms as property of the United States, was recognized by the secretary of the navy.

The grain corporation, although in form a trading corporation organized under the laws of Delaware, was formed in pursuance of an executive order as an agency to enable the United States food administrator to buy, store, and sell wheat, among other things. The executive order was issued under the war powers conferred upon the president by an act of Congress. In other words, the existence of the corporation was created to carry on activities required by the first world war and the corporation's property was held solely for that purpose.

In *United States v. Brown*, 247 N. Y. 211, 160 N. E. 13, the New York court of appeals held that, although all the stock of United States shipping board emergency fleet corporation was owned by United States, it was a private

corporation and as such might sue and be sued and was subject to statute of limitations. The court said:

"It is clear that the Fleet Corporation acts in two capacities. Notwithstanding the ownership of its stock by the United States, it is a private corporation. As such it is a distinct entity. It may make contracts and transact the business for which it is organized. It may sue and be sued. Then it is subject to the Statute of Limitations. (*Ingersoll-Rand Co. v. U. S. S. B. E. Fleet Corp.*, 195 App. Div. 838; *U. S. v. Strang*, 254 U. S. 491; *Sloan Shipyards Corp. v. U. S. Fleet Corporation*, 258 U. S. 549; *Gould Coupler Co. v. Fleet Corp.*, 261 Fed. Rep. 716.) But when a recovery may be had and a judgment enforced against it, again we do not discuss. Here that question is not involved. Further under the act of 1917 and the proclamation it had extraordinary powers. Under them it acts as an agency of the government for the prosecution of the war. It expends moneys of the United States appropriated for that purpose, on behalf of the government and to serve its ends.

"If the facts pleaded are sustained the government is 'the real contestant party to the  . . .  property . . . in controversy.' It has an interest in the suit. It has something 'to gain from the relief prayed for' and something 'to lose if the relief is denied.' It is not 'a mere formal complainant.' (*United States v. Beebe*, 127 U. S. 338.) It sues in its own right, not as assignee or trustee of the Fleet Corporation. It clearly might sustain such an action, again assuming the facts stated. (*Erickson v. United States*, 264 U. S. 246.)

"If the United States may maintain this action to recover public moneys, appropriated for war purposes, paid out by its agent, then its rights are not affected by our Statute of Limitations. (*United States v. Minnesota*, 270 U. S. 181; *Davis v. Corona Coal Co.*, 265 U. S. 219; *Dupont de Nemours & Co. v. Davis*, 264 U. S. 456.)"

In *Emergency Fleet Corp. v. Western Union*, 275 U. S. 415, 72 L. Ed. 345, 48 S. Ct. 198, the supreme court of the United States held that the fleet corporation was a department of the Federal government within the meaning of the post roads act; and that the facts that the corporation was in form a private corporation, that in sending messages it contracted on its own behalf and was suable on such contracts by the telegraph company, and that it competed in

some of its operations with private shipping, were not inconsistent with its being a department of the government within the post roads act, in view of its functional and physical relations to the United States and considering that, if it paid full commercial telegraph rates, the burden would fall upon the government.

In *United States v. Matthews*, 282 Fed. 266, the United States circuit court of appeals, ninth circuit, said:

"This action was instituted to recover a sum of money which it is alleged the plaintiff, by and through 'its agent or governmental department,' the Emergency Fleet Corporation, paid to the defendant J. J. Matthews, doing business under the firm name of J. J. Matthews & Co., through error and mistake. . . .

"The question presented for decision is whether the action should have been instituted by and in the name of the Emergency Fleet Corporation, instead of in the name of the the United States. Since the decision of the Supreme Court in the allied cases of *Sloan Shipyards Corporation et al. v. United States Shipping Board Emergency Fleet Corporation* and the *United States of America, Astoria Marine Iron Works v. United States Shipping Board Emergency Fleet Corporation,* and *United States Shipping Board Emergency Fleet Corporation, representing the United States of America, v. Roger B. Wood, Trustee in Bankruptcy,* 258 U. S. 549, 42 Sup. Ct. 386, 66 L. Ed. 762, there would seem to be no further question that the Fleet Corporation is not a governmental department or arm of the government possessing sovereignty, and that, while it is an entity capable of suing and being sued, it is a mere agent for carrying out the powers delegated to it by Congress, either directly or through the authority conferred upon the President. In its opinion in the cases above cited the court says:

" 'Supposing the powers of the Fleet Corporation to have been given to a single man, we doubt if any one would contend that the acts of Congress and the delegations of authority from the President left him any less liable than other grantees of the power of eminent domain to be called upon to defend himself in court. An instrumentality of government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts. . . . If what we have said is correct, it cannot matter that the agent is a corporation, rather than a single man. The meaning of incorporation is that you

have a person, and as a person one that presumably is subject to the general rules of law.' "

In *United States v. Skinner & Eddy Corp.*, 5 F. (2d) 708, a Federal district court held that, it being admitted that United States shipping board emergency fleet corporation, in contracting with shipbuilding corporation, acted on behalf of United States, it followed that the United States was the real party in interest and might sue on the contract.

In *Reconstruction Finance Corp. v. Krauss*, 12 F. Supp. 44, one of the United States district courts of New Jersey held that, as the finance corporation acted merely as a representative of the United States and functioned merely as an agency for the government, the United States, as principal, might intervene and prosecute any action for conservation of government's rights, or to recover moneys due its agency as such.

A Federal district court of Màssachusetts held, in cause No. 34, 11 F. (2d) 287, that, when the United States engages in a business enterprise, as operating merchant vessel (owned by the United States and operated by United States shipping board), the United States government is subject to same conditions as a private citizen; that, where collision between scow and steamer, both operated by shipping board, occurred in September, 1920, and scow was sold in August, 1922, without notice of any lien, defense of laches could be set up against United States for not proceeding against scow between September, 1920, and August, 1922. The court cited, in support of the rule that, when the United States engages in a business enterprise, it is subject to the same conditions as private citizens: *The Llama*, 267 U. S. 76, 69 L. Ed. 519, 45 S. Ct. 211, 1925 A. M. C. 323; *Mountain Copper Co. v. United States*, 142 Fed. 625, 73 C. C. A. 621; *Gould Coupler Co. v. U. S. Shipping Board*, 261 Fed. 716; *Rosenberg Bros. & Co. v. U. S. Shipping Board*, 295 Fed. 372, 380.

In *Shooters Island S. Co. v. Standard Shipbuilding Corp.*, 293 Fed. 706, the United States circuit court of appeals, third circuit, held that the emergency fleet corporation, in its business transactions as a distinct corporate entity, is

bound to observe the law of the state in which it is doing business, and in such transactions it does not stand in the place of the government, so as to share the immunity of the sovereign. See, also, *U. S. Shipping Board v. South Atlantic Dry Dock Co.*, 300 Fed. 56; *Federal Sugar Refining Co. v. U. S. S. E. Board*, 268 Fed. 575.

In *Pope v. U. S. Shipping Board*, 269 Fed. 319, a Federal district court of Florida held that the emergency fleet corporation, which was organized with the ordinary powers and liabilities of corporations, but all of whose stock is owned by the United States, and which operates on money provided by the government, is not a governmental establishment, and may be sued without the consent of Congress to such suit. In the course of its opinion, the court said:

"The Circuit Court of Appeals for the Second Circuit, in the case of *Salas v. U. S.*, 234 Fed. 842, 148 C. C. A. 440, held that a conspiracy to defraud the Panama Railway, the stock in which was owned by the United States, the operating expenses paid by the United States, and the receipts from such operation the property and money of the United States, was not a conspiracy to defraud the United States; and this decision, as I understand it, was made upon the authority of *Bank of the United States v. Planters' Bank of Georgia*, above. See, also, *Gould Coupler Co. v. This Defendant* and *Employers' Liability Assurance Corporation v. This Defendant*, 261 Fed. 716, decided by Judge Hand in the Southern District of New York.

"It is true that the Circuit Court of Appeals of the Ninth Circuit in *Ballaine v. Alaskan Northern Railway*, 259 Fed. 183, 170 C. C. A. 251, 8 A. L. R. 990, held that a suit against the railway company was a suit against the United States, and could not be maintained; this holding being based upon the fact that the United States owned the stock of the railway, operated it, paid its expenses, and received the returns from such operation, which is exactly contrary to the holding in the *Salas* case. Giving both decisions careful consideration, the *Salas* case impresses me as being based on sounder principles, and I therefore follow it."

In *Harwood v. U. S. Shipping Board*, 32 F. (2d) 680, the United States circuit court of appeals, second circuit, held that, though in making contracts for construction of vessels fleet corporation was exercising powers derived from execu-

tive orders issued pursuant to urgent deficiency act June 15, 1917 (40 Stat. 182), for the purpose of carrying out its provisions, fleet corporation was a principal and responsible as such, and that the United States was not a proper party defendant as against claim that fleet corporation was acting as agent of United States in making contracts. Compare *United, States v. Skinner & Eddy Corp.* (circuit court of appeals, ninth circuit), 35 F. (2d) 889.

In *North Dakota-Montana W. G. Ass'n v. United States* (United States circuit court of appeals, eighth circuit), 66 F. (2d) 573, 92 A. L. R. 1484, it was held that (1) the Federal farm board created by the agricultural marketing act is merely an unincorporated agency to carry out the purposes of the act, and as such has no identity separate and distinct from the Federal government; (2) in lending money to a farmers' co-operative association through the Federal farm board, and subsequently trying to collect it for the benefit of the national treasury, the Federal government did not enter into private business or become a trading partner, but, in acting for the protection of the nation's food supply and the stimulation of agriculture, was exercising a sovereign function of government; (3) the United States, as the real party in interest, may bring suit to foreclose a mortgage securing a loan made through the Federal farm board as its agent; and (4) one accepting a loan from the Federal farm board organized under the Federal marketing act is not in a position to question the constitutionality of the act in a proceeding to enforce a mortgage securing the loan.

In *Hartford Production Credit Ass'n v. Clark,* 118 Conn. 341, 172 Atl. 266, the supreme court of Connecticut, in an action for a declaratory judgment, held that plaintiff association was a Federal agency within the meaning of a Connecticut statute which authorized any person, association, partnership, or corporation engaged in that state in the business of farming, cattle raising, or marketing of livestock to enter into an agreement with and borrow funds from Reconstruction Finance Corporation or any Federal agency authorized to lend money to agricultural producers and give as security for such loan a note secured by a chattel mort-

gage upon farm equipment, livestock, and crops of the borrower.

Shortly following Connecticut's enactment of foregoing statute, Congress passed farm credit act of 1933, under which administration of the lending of funds to agricultural producers was superseded by the organization's set-up in the 1933 act under the head of the farm credit administration. The title of the farm credit act announced the primary purpose of the legislation was to provide for organizations, within the farm credit administration, to make loans for the production and marketing of agricultural products. Hartford Production Credit Association was organized, like respondent, pursuant to Congressional authorization.

I consider it not amiss to observe that, in the travail of the political upheaval commencing in 1932, much was born that I deem not legitimate under our constitution. America started in the direction of state collectivism under the domination of a vast bureaucracy. In consideration of Federal bounty, states surrendered their sovereignty. If by our own opinions we bring our decisions "into the same class as a restricted railroad ticket, good for this day and train only" (dissenting opinion of Mr. Justice Roberts in *Smith v. Allwright, supra*), why should we accept, as foreclosing any question, the opinion of the supreme court of a sister state?

I took without any mental reservation an oath to support the constitution of the United States. I cannot, in good conscience, subscribe to the view that I should unreservedly support that constitution as it is interpreted by others. If I follow an interpretation which I am convinced erroneously contributes to the movement to change our form of government into other than a representative republic, I am not supporting the constitution and preserving the safeguards of liberty against all enemies, domestic and foreign.

Yes, I have a vow registered in Heaven to preserve the constitution, while those who urge revolutionary change in our form of government have no such vow registered. Did I not resist each and every encroachment, the ultimate objective of which is the destruction of liberty under law

controlled and carried on through the institutions of representative government, I would be recreant to God and America, unmindful of the sacrifices of the founding fathers, and inappreciative of the sufferings of those now undergoing the horrors of the second world war in order to preserve constitutional safeguards, which some, on the score of expediency or necessity and in utter disregard of basic legal principles, seek to sweep away.

Each state comprising the southern confederacy was a sovereign, as was the Federal government, before the United States defeated the armies of the southern confederacy. By that defeat, as argued by Mr. Field in behalf of William H. McCardle in the supreme court of the United States in 1868, the United States did not succeed to the sovereignty of any of the states of the former southern confederacy, as the laws of conquest have no application to a civil war. May it be logically argued that, under the constitution, the Federal government may delegate to or vest in a bureaucracy any part of the sovereignty of any or all of the forty-eight states? That is the next step the courts may validate if it be held that the Federal government may engage in private business and, functioning as a private corporation, invoke the privileges and immunities inherent in sovereignty.

We are informed by Lawrence Sullivan in his book entitled "Bureaucracy Runs Amuck," that at the end of World War I there were thirty Federal administrative units, including the wartime emergency bureaus; today there are more than two hundred Federal departments, commissions, boards, and independent agencies, which maintain about sixteen hundred branch offices throughout the country, not including local rationing boards. The bureaus rule by executive orders, and, unless invalidated by the courts, those orders are presumed to have the full authority of law. Our government has, as stated by United States Representative Eugene E. Cox, of Georgia, a veteran of twenty-five years' service in the house, in large part, been taken away from the people of this country and delivered into the keeping of those not in sympathy with our form of government.

Representative Howard W. Smith of Virginia said: "We must bring these administrative rules and orders back within the bounds of due process," in outlining his program for a special committee to investigate bureaucratic excesses. He further said:

"Of course, we are at war, and we must win it. I do not want this country to awaken after we have won the war and find that we have lost the form of government that was founded here 150 years ago. We should be very careful in this congress to take every step that is necessary to see that our form of government is preserved during the emergency."

We must—it is the duty of all, especially those who have taken the oath to support the constitution—actively resist each and every effort to change our form of government.

By enactments of legislative bodies of our country, there have been created during the past few years bureaus and departments to regulate each and every act of each and every human being from the cradle to the grave. Those enactments purportedly delegate not only legislative power to, but also vest judicial power in, such bureaus and departments. Judicial power cannot constitutionally be delegated to bureaus, OPA, WLB, or other alphabetical bureaus and commissions.

In *Ex parte Milligan,* 4 Wall. (71 U. S.) 2, 18 L. Ed. 281, the United States supreme court held that military commissions, organized during the war between the states in a state not invaded and not engaged in rebellion, in which the Federal courts were open and in the proper and unobstructed exercise of their judicial functions, had no jurisdiction to try, convict, or sentence for any criminal offense a citizen who was neither a resident of one of the seceding states, nor a prisoner of war, nor a person in the military or naval service, and Congress could not invest them with any such power.

The argument of Justice Black in behalf of the petitioner is, as is the court's opinion in that case, a complete answer to the question whether judicial power can constitutionally

be invested by the legislative body in any department or tribunal other than a court. In arguing that it was the intention of the founding fathers to put the life, liberty, and property of every person in this republic under the protection of a judiciary, and not a bureau, Justice Black said, in part:

"If the fundamental principles of American liberty are attacked, and we are driven behind the inner walls of the constitution to defend them, we can repel the assault only with those same old weapons which our ancestors used a hundred years ago. You must not think the worse of our armor because it happens to be old-fashioned, and looks a little rusty from long disuse. . . .

"The states and the people agreed to bestow upon the government a certain portion of the judicial power, which otherwise would have remained in their own hands, but gave it on a solemn trust, and coupled the grant of it with this express condition that it should never be used in any way but one,—that is, by means of ordained and established courts. Any person, therefore, who undertakes to exercise judicial power in any other way, not only violates the law of the land, but he treacherously tramples upon the most important part of that sacred covenant which holds these states together. . . .

" . . . you know, and I know, and everybody else knows, that it was the intention of the men who founded this republic to put the life, liberty, and property of every person in it under the protection of a regular and permanent judiciary, [not a bureau] separate, apart, distinct from all other branches of the government, whose sole and exclusive business it should be to distribute justice among the people according to the wants of each individual. It was to consist of courts. . . . In these courts it was expected that judges would sit who would be upright, honest, and sober men, learned in the laws of their country, and lovers of justice from the habitual practice of that virtue; independent . . . and free from party passion . . . above the clamors of the mere mob, and beyond the reach of executive influence. . . . In ordinary, tranquil times, the citizen might feel himself safe under a judicial system so organized. But our wise forefathers knew that tranquility was not to be always anticipated in a republic. They expected that strife would arise between classes and sections, . . . and they supposed that in such times judges

themselves might not be safely trusted in criminal cases,—
especially in prosecutions for political offenses, when the
whole power of the executive is arrayed against the accused
party. All history proves that public officers of any govern-
ment, when they are engaged in a severe struggle to retain
their places, become bitter and ferocious, and hate those
who oppose them, even in the most legitimate way, with a
rancor which they never exhibit toward actual crime. This
kind of malignity vents itself in prosecutions . . . and
the charges are generally founded upon the information of ·
hireling spies and common delators, who make merchan-
dise of their oaths, and trade in the blood of their fellow
men. During the civil commotions in England, which lasted
from the beginning of the reign of Charles I. to the revolu-
tion of 1688, the best men and the purest patriots that ever
lived fell by the hand of the public executioner. Judges
were made the instruments for inflicting the most merciless
sentences on men the latchet of whose shoes the ministers
that prosecuted them were not worthy to stoop down and
unloose. . . . The highest compliment that has ever been
paid to the American bench is embodied in this simple fact:
that if the executive officers of this government have ever
desired to take away the life or the liberty of a citizen con-
trary to law, they have not come into the courts to get it
done; they have gone outside of the courts, and stepped
over the constitution, and created their own tribunals, com-
posed of men whose gross ignorance and supple subservi-
ence could always be relied on for those base uses to which
no judge would ever lend himself. But the framers of the
constitution could act only upon the experience of that
country whose history they know most about, and there
they saw the brutal ferocity of Jeffreys and Scroggs, the
timidity of Guilford, and the base venality of such men as
Saunders and Wright. It seemed necessary, therefore, not
only to make the judiciary as perfect as possible, but to
give the citizen yet another shield against the wrath and
malice of his government. To that end they could think of
no better provision than a public trial before an impartial
jury.

"If the men who fought out our Revolutionary contest,
when they came to frame a government for themselves and
their posterity, had failed to insert a provision making the
trial by jury perpetual and universal, they would have
covered themselves all over with infamy as with a garment,
for they would have proved themselves basely recreant to

the principles of that very liberty of which they professed to be the special champions. But they were guilty of no such treachery. They not only took care of the trial by jury, but they regulated every step to be.taken in a criminal trial. They knew very well that no people could be free under a government which had the power to punish without restraint. Hamilton expressed in the 'Federalist' the universal sentiment of his time when he said that the arbitrary power of conviction and punishment for pretended offenses had been the great engine of despotism in all ages and all countries. The existence of such a power is utterly incompatible with freedom. The difference between a master and his slave consists only in this: that the master holds the lash in his hands, and he may use it without legal restraint, while the naked back of the slave is bound to take whatever is laid on it. But our fathers were not absurd enough to put unlimited power in the hands of the ruler, and take away the protection of law from the rights of individuals. It was not thus that they meant 'to secure the blessings of liberty to themselves and their posterity.' They determined that not one drop of the blood which had been shed on the other side of the Atlantic during seven centuries of contest with arbitrary power should sink into the ground, but the fruits of every popular victory should be garnered up in this new government. Of all the great rights already won they threw not an atom away. They went over Magna Charta, the petition of rights, the bill of rights, and the rules of the common law, and whatever was found there to favor individual liberty they carefully inserted in their own system, improved by clearer expression, strengthened by heavier sanctions, and extended by a more universal application. They put all those provisions into the organic law, so that neither tyranny in the executive nor party rage in the legislature could change them without destroying the government itself.

"Look for a moment at the particulars, and see how carefully everything connected with the administration of punitive justice is guarded.

" . . . No man shall be answerable criminally for any act which was not defined and made punishable as a crime by some law in force at the time when the act was done.

"He shall be informed of the accusation, its nature and grounds. . . .

"Then comes the trial, and it must be before a regular court, of competent jurisdiction, ordained and established

for the state and district in which the crime was committed; and this shall not be evaded by a legislative change in the district after the crime is alleged to be done.

"His guilt or innocence shall be determined by an impartial jury.

"A tyrannical government calls everybody a traitor who shows the least unwillingness to be a slave. The party in power never fails, when it can, to stretch the law on that subject by construction, so as to cover its honest and conscientious opponents. . . . Those men who think we can be subjected and abjected to the condition of mere slaves are wholly mistaken. The great race to which we belong has not degenerated so fatally. But how am I to prove the existence of these rights? I do not propose to do it by a long chain of legal argumentation, nor by the production of numerous books with the leaves dog-eared and the pages marked. If it depended upon judicial precedents, I think I could produce as many as might be necessary. If I claimed this freedom under any kind of prescription, I could prove a good long possession in ourselves and those under whom we claim it. I might begin with Tacitus, and show how the contest arose in the forests of Germany more than two thousand years ago; how the rough virtues and sound common sense of that people established the right of trial by jury, and thus started on a career which has made their posterity the foremost race that ever lived in all the tide of time. The Saxons carried it to England, and were ever ready to defend it with their blood. It was crushed out by the Danish invasion; and all that they suffered of tyranny and oppression during the period of their subjugation resulted from the want of trial by jury. If that had been conceded to them, the reaction would not have taken place which drove back the Danes to their frozen homes in the north. But those ruffian sea kings could not understand that, and the reaction came. Alfred, the greatest of revolutionary heroes, and the wisest monarch that ever sat on a throne, made the first use of his power, after the Saxons restored it, to re-establish their ancient laws. He had promised them that he would, and he was true to them, because they had been true to him. But it was not easily done. The courts were opposed to it, for it limited their power; a kind of power that everybody covets,—the power to punish without regard to law. He was obliged to hang forty-four judges in one year for refusing to give his subjects a trial by jury. When the historian says that he hung them,

it is not meant that he put them to death without a trial. He had them impeached before the grand council of the nation, the Wittenagemote, the parliament of that time. During the subsequent period of Saxon domination, no man on English soil was powerful enough to refuse a legal trial to the meanest peasant. If any minister or any king, in war or in peace, had dared to punish a freeman by a tribunal of his own appointment, he would have roused the wrath of the whole population. All orders of society would have resisted it,—lord and vassal, knight and squire, priest and penitent, bocman and socman, master and thrall, copyholder and villein, would have risen in one mass, and burned the offender to death in his castle, or followed him in his flight and torn him to atoms. It was again trampled down by the Norman conquerors; but the evils resulting from the want of it united all classes in the effort which compelled King John to restore it by the Great Charter. Everybody is familiar with the struggles which the English people, during many generations, made for their rights with the Plantagenets, the Tudors, and the Stuarts, and which ended finally in the revolution of 1688, when the liberties of England were placed upon an impregnable basis by the bill of rights. Many times the attempt was made to stretch the royal authority far enough to justify military trials, but it never had more than temporary success. Five hundred years ago Edward II. closed up a great rebellion by taking the life of its leader, the Earl of Lancaster, after trying him before a military court. Eight years later that same king, together with his lords and commons in parliament assembled, acknowledged with shame and sorrow that the execution of Lancaster was a mere murder, because the courts were open, and he might have had a legal trial. Queen Elizabeth, for sundry reasons affecting the safety of the state, ordered that certain offenders not of her army should be tried according to the law martial; but she heard the storm of popular vengeance rising, and, haughty, imperious, self-willed as she was, she yielded the point, for she knew that upon that subject the English people would never consent to be trifled with. Strafford, as lord lieutenant of Ireland, tried the Viscount Stormont before a military commission. When impeached for it, he pleaded in vain that Ireland was in a state of insurrection, that Stormont was a traitor, and the army would be undone if it could not defend itself without appealing to the civil courts. The parliament was deaf; the king himself could not save him; he was condemned to suffer death as a traitor and a murderer. Charles

I. issued commissions to divers officers for the trial of his enemies according to the course of military law. If rebellion ever was an excuse for such an act, he could surely have pleaded it, for there was scarcely a spot in his kingdom, from sea to sea, where the royal authority was not disputed by somebody. Yet the parliament demanded in their petition of right, and the king was obliged to concede, that all his commissions were illegal. James II. claimed the right to suspend the operation of the penal laws,—a power which the courts denied,—but the experience of his predecessors taught him that he could not suspend any man's right to a trial. He could easily have convicted the seven bishops of any offense he saw fit to charge them with if he could have selected their judges from among the mercenary creatures to whom he had given commands in his army; but this he dared not do. He was obliged to send the bishops to a jury, and endure the mortification of seeing them acquitted. He, too, might have had rebellion for an excuse, if rebellion be an excuse. The conspiracy was already ripe which, a few months afterwards, made him an exile and an outcast. He had reason to believe that the Prince of Orange was making his preparations on the other side of the channel to invade the kingdom, where thousands burned to join him; nay, he pronounced the bishops guilty of rebellion by the very act for which he arrested them. He had raised an army to meet the rebellion, and he was on Hounslow Heath, reviewing the troops organized for that purpose, when he heard the great shout of joy that went up from Westminster Hall, was echoed back from Templar Bar, spread down the city and over the Thames, and rose from every vessel on the river,—the simultaneous shout of two hundred thousand men for the triumph of justice and law.

"If it were worth the time, I might detain you by showing how this subject was treated by the French court of cassation, in Geoffroy's case, under the constitution of 1830, when a military judgment was unhesitatingly pronounced to be void, though ordered by the king, after a proclamation declaring Paris in a state of siege. . . . Every elementary writer from Coke to Wharton is against him. All military authors, who profess to know the duties of their profession, admit themselves to be under, not above, the laws. No book can be found in any library to justify the assertion that military tribunals may try a citizen at a place where the courts are open. When I say no book, I mean, of course, no book of acknowledged authority. I do not deny that hireling clergymen have often been found to disgrace the

pulpit by trying to prove the divine right of kings and other rulers to govern as they please. It is true, also, that court sycophants and party hacks have many times written pamphlets, and perhaps large volumes to show that those whom they serve should be allowed to work out their bloody will upon the people. No abuse of power is too flagrant to find its defenders among such servile creatures. Those butchers' dogs, that feed upon garbage and fatten upon the offal of the shambles, are always ready to bark at whatever interferes with the trade of their master. But this case does not depend on authority. It is rather a question of fact than of law. I prove my right to a trial by jury, just as I would prove my title to an estate if I held in my hand a solemn deed conveying it to me coupled with undeniable evidence of long and undisturbed possession under and according to the deed. There is the charter by which we claim to hold it. It is called the 'Constitution of the United States.' It is signed by the sacred name of George Washington, and by thirty-nine other names, only less illustrious than his. They represented every independent state then upon this continent, and each state afterwards ratified their work by a separate convention of its own people. Every state that subsequently came in acknowledged that this was the great standard by which their rights were to be measured. Every man that has ever held office in this country, from that time to this, has taken an oath that he would support and sustain it through good report and through evil. . . . What does it contain? . . . 'No person shall . . . be deprived of life, liberty, or property without due process of law'; . . . 'in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law; and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for the witnesses in his favor; and to have the assistance of counsel for his defense.' . . .

"But we are answered that the judgment under consideration was pronounced in time of war, and it is therefore, at least morally, excusable. There may, or there may not, be something in that. I admit that the merits or demerits of any particular act, whether it involve a violation of the constitution or not, depend upon the motives that prompted it, the time, the occasion, and all the attending

circumstances. When the people of this country come to decide upon the acts of their rulers, they will take all these things into consideration. But that presents the political aspect of the case, with which, I trust, we have nothing to do here. I decline to discuss it. I would only say, in order to prevent misapprehension, that I think it is precisely in a time of war and civil commotion that we should double the guards upon the constitution. If the sanitary regulations which defend the health of a city are ever to be relaxed, it ought certainly not to be done when pestilence is abroad. When the Mississippi shrinks within its natural channel, and creeps lazily along the bottom, the inhabitants of the adjoining shore have no need of a dike to save them from inundation; but when the booming flood comes down from above, and swells into a volume which rises high above the plain on either side, then a crevasse in the levee becomes a most serious thing. So in peaceable and quiet times our legal rights are in little danger of being overborne; but when the wave of arbitrary power lashes itself into violence and rage, and goes surging up against the barriers which were made to confine it, then we need the whole strength of an unbroken constitution to save us from destruction.

. . .

"There is another quasi-political argument,—necessity. If the law was violated because it could not be obeyed, that might be an excuse. But no absolute compulsion is pretended here. These commissioners acted, at most, under what they regarded as a moral necessity. The choice was left them to obey the law or disobey it. The disobedience was only necessary as means to an end which they thought desirable; and now they assert that, though these means are unlawful and wrong, they are made right, because without them the object could not be accomplished—in other words, the end justified the means. There you have a rule of conduct denounced by all law, human and divine, as being pernicious in policy and false in morals. See how it applies to this case. Here were three men whom it was desirable to remove out of this world, but there was no proof on which any court would take their lives; therefore it was necessary, and, being necessary, it was right and proper, to create an illegal tribunal which would put them to death without proof. By the same mode of reasoning, you can prove it equally right to poison them in their food, or stab them in their sleep. Nothing that the worst men ever propounded has produced so much oppression, misgovernment,

and suffering as this pretense of state necessity. A great authority calls it 'the tyrant's devilish plea,' and the common honesty of all mankind has branded it with everlasting infamy. Of course, it is mere absurdity to say that these relators were necessarily deprived of their right to a fair and legal trial, for the record shows that a court of competent jurisdiction was sitting at the very time, and in the same town, where justice would have been done without sale, denial, or delay. But concede, for the argument's sake, that a trial by jury was wholly impossible; admit that there was an absolute, overwhelming, imperious necessity operating so as literally to compel every act which the commissioners did,—would that give their sentence of death the validity and force of a legal judgment pronounced by an ordained and established court? The question answers itself. This trial was a violation of law, and no necessity could be more than a mere excuse for those who committed it. If the commissioners were on trial for murder or conspiracy to murder, they might plead necessity, if the fact were true, just as they would plead insanity or anything else to show that their guilt was not willful. But we are now considering the legal effect of their decision, and that depends on their legal authority to make it. They had no such authority; they usurped a jurisdiction which the law not only did not give them, but expressly forbade them to exercise, and it follows that their act is void, whatever may have been the real or supposed excuse for it. If these commissioners, instead of aiming at the life and liberty of the relators, had attempted to deprive them of their property by a sentence of confiscation, would any court in Christendom declare that such a sentence divested the title? Or would a person claiming under the sentence make his right any better by showing that the illegal assumption of jurisdiction was accompanied by some excuse which might save the commissioners from a criminal prosecution?

"Suppose you, the judges of this court, to be surrounded in the hall where you are sitting by a body of armed insurgents, and compelled, by main force, to pronounce sentence of death upon the president of the United States for some act of his upon which you have no legal authority to adjudicate. There would be a valid sentence if necessity alone could create jurisdiction. But could the president be legally executed under it? No; the compulsion under which you acted would be a good defense for you against an impeachment or an indictment for murder, but it would add

nothing to the validity of a judgment which the law forbade you to give. That a necessity for violating the law is nothing more than a mere excuse to the perpetrator, and does not, in any legal sense, change the quality of the act itself in its operation upon other parties, is a proposition too plain on original principles to need the aid of authority. I do not see how any man of common sense is to stand up and dispute it. But there is decisive authority upon the point. In 1815, at New Orleans, General Jackson took upon himself the command of every person in the city, suspended the functions of all the civil authorities, and made his own will for a time the only rule of conduct. It was believed to be absolutely necessary. Judges, officers of the city corporation, and members of the state legislature insisted on it as the only way to save the 'booty and beauty' of the place from the unspeakable outrages committed at Badajos and St. Sebastian by the very same troops then marching to the attack. Jackson used the power thus taken by him moderately, sparingly, benignly, and only for the purpose of preventing mutiny in his camp. A single mutineer was restrained by a short confinement, and another was sent four miles up the river. But, after he had saved the city, and the danger was all over, he stood before the court to be tried by the law. His conduct was decided to be illegal by the same judge who had declared it to be necessary, and he paid the penalty without a murmur. The supreme court of Louisiana, in *Johnson v. Duncan,* decided that everything done during the siege in pursuance of martial rule, but in conflict with the law of the land, was void and of no effect, without reference to the circumstances which made it necessary. Long afterwards the fine imposed upon Jackson was refunded, because his friends, while they admitted him to have violated the law, insisted that the necessity which drove him to it ought to have saved him from the punishment due only to a willful offender.

"They will hardly take the ground that any kind of necessity could give legal validity to that which the law forbids. This, therefore, must be their position: That, although there was no war at the place where this commission sat, and no actual necessity for it, yet, if there was a war anywhere else, to which the United States were a party, the technical effect of such war was to take the jurisdiction away from the civil courts and transfer it to army officers.

"They will admit that the constitution is not altogether without a meaning; that, at a time of universal peace, it

imposes some kind of obligation upon those who swear to support it. If no war existed, they would not deny the exclusive jurisdiction of the civil courts in criminal cases. How, then, did the military get jurisdiction in Indiana? All men who hold the attorney general's opinion to be true, answer the question I have put by saying that military jurisdiction comes from the mere existence of war; and it comes in Indiana only as the legal result of a war which is going on in Mississippi, Tennessee, or South Carolina. The constitution is repealed, or its operation suspended, in one state, because there is war in another. The courts are open, the organization of society is intact, the judges are on the bench, and their process is not impeded; but their jurisdiction is gone. Why? Because, say our opponents, war exists, and the silent, legal, technical operation of that fact is to deprive all American citizens of their right to a fair trial. That class of jurists and statesmen who hold that the trial by jury is lost to the citizen during the existence of war carry out their doctrine theoretically and practically to its ultimate consequences. The right of trial by jury being gone, all other rights are gone with it. Therefore a man may be arrested without an accusation, and kept in prison during the pleasure of his captors; his papers may be searched without a warrant; his property may be confiscated behind his back; and he has no earthly means of redress,—nay, an attempt to get a just remedy is construed as a new crime. He dare not even complain, for the right of free speech is gone with the rest of his rights. If you sanction that doctrine, what is to be the consequence? I do not speak of what is past and gone; but in case of a future war, what results will follow from your decision indorsing the attorney general's views? They are very obvious. At the instant when the war begins, our whole system of legal government will tumble into ruin, and, if we are not all robbed and kidnapped and hanged and drawn and quartered, we will owe our immunity, not to the constitution and laws, but to the mere mercy or policy of those persons who may then happen to control the organized physical force of the country.

"The convention when it framed the constitution, and the people when they adopted it, could have had no thought like that. If they had supposed that it would operate only while perfect peace continued, they certainly would have given us some other rule to go by in time of war; they would not have left us to wander about in a howling wilderness

of anarchy, without a lamp to our feet or a guide to our path. . . . They required that every man in any kind of public employment, state or national, civil or military, should swear, without reserve or qualification, that he would support the constitution. Surely our ancestors had too much regard for the moral and religious welfare of their posterity to impose upon them an oath like that if they intended and expected it to be broken half the time. The oath of an officer to support the constitution is as simple as that of a witness to tell the truth in a court of justice. What would you think of a witness who should attempt to justify perjury upon the ground that he had testified when civil war was raging, and he thought that, by swearing to a lie, he might promote some public or private object connected with the strife.

"But in all this storm of disaster, with foreign war in his front, and domestic treason on his flank, Madison gave out no sign that he would aid Old England and New England to break up this government of laws. On the contrary, he and all his supporters, though compassed round with darkness and with danger, stood faithfully between the constitution and its enemies—

" 'To shield it, and save it, or perish there too.'

"The framers of the constitution and all their contemporaries died and were buried; their children succeeded them, and continued on the stage of public affairs until they, too,

" 'Lived out their lease of life, and paid their breath
To time and mortal custom.'

"And a third generation was already far on its way to the grave before this monstrous doctrine was conceived or thought of,—that public officers all over the country might disregard their oaths whenever a war or a rebellion was commenced.

"Our friends on the other side are quite conscious that, when they deny the binding obligation of the constitution, they must put some other system of law in its place. . . .

"The attorney general tells us that all persons whom he and his associates choose to denounce for giving aid to the rebellion are to be treated as being themselves a part of the rebellion,—they are public enemies, and therefore they may be punished without being found guilty by a competent court or a jury. This convenient rule would outlaw every citizen the moment he is charged with a political offense. But political offenders are precisely the class of

persons who most need the protection of a court and jury, for the prosecutions against them are most likely to be unfounded both in fact and in law. Whether innocent or guilty, to accuse is to convict them before the ignorant and bigoted men who generally sit in military courts. But this court decided in the Prize Cases that all who live in the enemy's territory are public enemies, without regard to their personal sentiments or conduct; and the converse of the proposition is equally true,—that all who reside inside of our own territory are to be treated as under the protection of the law. If they help the enemy, they are criminals; but they cannot be punished without legal conviction.

"You have heard much (and you will hear more very soon) concerning the natural and inherent right of the government to defend itself without regard to law. This is wholly fallacious. In a despotism the autocrat is unrestricted in the means he may use for the defense of his authority against the opposition of his own subjects or others, and that is precisely what makes him a despot; but in a limited monarchy the prince must confine himself to a legal defense of his government. If he goes beyond that, and commits aggressions on the rights of the people, he breaks the social compact, releases his subjects from all their obligations to him, renders himself liable to be hurled from his throne, and dragged to the block or driven into exile. This principle was sternly enforced in the cases of Charles I. and James II., and we have it announced on the highest official authority here that the Queen of England cannot ring a little bell on her table, and cause a man, by her arbitrary order, to be arrested under any pretense whatever. If that be true there, how much more true must it be here, where we have no personal sovereign, and where our only government is the constitution and laws! A violation of law, on pretense of saving such a government as ours, is not self-preservation, but suicide.

"No human being in this country can exercise any kind of public authority which is not conferred by law; and under the United States it must be given by the express words of a written statute. Whatever is not so given is withheld, and the exercise of it is positively prohibited. . . . Within the last five years we have seen, for the first time, self-constituted tribunals not only assuming power which the law did not give them, but thrusting aside the regular courts to which the power was exclusively given. What is the consequence? This terrible authority is wholly

undefined, and its exercise is without any legal control. Undelegated power is always unlimited. The field that lies outside of the constitution and laws has no boundary. Thierry, the French historian of England, says that, when the crown and scepter were offered to Cromwell, he hesitated for several days, and answered: 'Do not make me a king, for then my hands will be tied up by the laws which define the duties of that office; but make me protector of the commonwealth, and I can do what I please, — no statute restraining and limiting the royal prerogative will apply to me.' So these commissions have no legal origin and no legal name by which they are known among the children of men; no law applies to them; and they exercise all power for the paradoxical reason that none belongs to them rightfully.

"You assert the right of the executive government, without the intervention of the judiciary, to capture, imprison, and kill any person to whom that government or its paid dependents may choose to impute an offense. This, in its very essence, is despotic and lawless. It is never claimed or tolerated except by those governments which deny the restraints of all law. It has been exercised by the great and small oppressors of mankind ever since the days of Nimrod. It operates in different ways; the tools it uses are not always the same; it hides its hideous features under many disguises; it assumes every variety of form;

" 'It can change shapes with Proteus for advantages,
  And set the murderous Machiavel to school.'

"But in all its mutations of outward appearance it is still identical in principle, object, and origin. It is always the same great engine of despotism which Hamilton described it to be.

"Under the old French monarchy the favorite fashion of it was a *lettre de cachet*, signed by the king, and this would consign the party to a loathsome dungeon until he died, forgotten by all the world. An imperial *ukase* will answer the same purpose in Russia. The most faithful subject of that amiable autocracy may lie down in the evening to dream of his future prosperity, and before daybreak he will find himself between two dragoons on his way to the mines of Siberia. In Turkey, the verbal order of the sultan or any of his powerful favorites will cause a man to be tied up in a sack and cast into the Bosphorus. Nero accused Peter and Paul of spreading a 'pestilent superstition,' which they called the Gospel. He heard their defense in

person, and sent them to the cross. Afterwards he tried the whole Christian church in one body on a charge of setting fire to the city, and he convicted them, though he knew, not only that they were innocent, but that he himself had committed the crime. The judgment was followed by instant execution. He let loose the Praetorian guards upon men, women, and children, to drown, butcher, and burn them. Herod saw fit, for good political reasons, closely affecting the permanence of his reign in Judea, to punish certain possible traitors in Bethlehem by anticipation. This required the death of all the children in that city under two years of age. He issued his 'general order'; and his provost marshal carried it out with so much alacrity and zeal that in one day the whole land was filled with mourning and lamentation. Macbeth understood the whole philosophy of the subject. He was an unlimited monarch. His power to punish for any offense or for no offense at all was as broad as that which the attorney general claims for himself and his brother officers under the United States. But he was more cautious how he used it. He had a dangerous rival, from whom he apprehended the most serious peril to the 'life of his government.' The necessity to get rid of him was plain enough, but he could not afford to shock the moral sense of the world by pleading political necessity for a murder. He must

" 'Mask the business from the common eye.'

"Accordingly, he sent for two enterprising gentlemen, whom he took into his service upon liberal pay, 'made love to their assistance,' —and got them to deal with the accused party. He acted as his own judge advocate. He made a most elegant and stirring speech to persuade his agents that Banquo was their oppressor, and had 'held them so under fortune' that he ought to die for that alone. When they agreed that he was their enemy, then said the king:

" 'So is he mine, and though I could,
    With barefaced power, sweep him from my sight,
    And bid my will avouch it, yet I must not,
    For certain friends, who are both his and mine,
    Whose loves I may not drop.'

"For these, and 'many weighty reasons' besides, he thought it best to commit the execution of his design to a subordinate agency. The commission thus organized in Banquo's case sat upon him that very night, at a convenient place beside the road where it was known he would be traveling; and they did precisely what the attorney general

says the military officers may do in this country, — they took and killed him, because their employer at the head of the government wanted it done, and paid them for doing it out of the public treasury.

"But of all the persons that ever wielded this kind of power, the one who went most directly to the purpose and object of it was Lola Montez. She reduced it to the elementary principle. In 1848, when she was minister and mistress to the King of Bavaria, she dictated all the measures of the government. The times were troublesome. All over Germany the spirit of rebellion was rising; everywhere the people wanted to see a first-class revolution, like that which had just exploded in France. Many persons in Bavaria disliked to be governed so absolutely by a lady of the character which Lola Montez bore, and some of them were rash enough to say so. Of course that was treason, and she went about to punish it in the simplest of all possible ways. She bought herself a pack of English bull dogs, trained to tear the flesh, and mangle the limbs, and lap the life blood, and with these dogs at her heels, she marched up and down the streets of Munich with a most majestic tread, and with a sense of power which any judge advocate in America might envy. When she saw any person whom she chose to denounce for 'thwarting the government' or 'using disloyal language,' her obedient followers needed but a sign to make them spring at the throat of their victim. It gives me unspeakable pleasure to tell you the sequel. The people rose in their strength, smashed down the whole machinery of oppression, and drove out into uttermost shame king, strumpet, dogs, and all. From that time to this neither man, woman, nor beast has dared to worry or kill the people of Bavaria.

"All these are but so many different ways of using the arbitrary power to punish. The variety is merely in the means which a tyrannical government takes to destroy those whom it is bound to protect. Everywhere it is but another construction, on the same principle, of that remorseless machine by which despotism wreaks its vengeance on those who offend it. . . . In none of its forms can it be introduced into this country. We have no room for it; the ground here is all preoccupied by legal and free institutions. Between the officers who have a power like this and the people who are liable to become its victims, there can be no relation except that of master and slave. The master may be kind, and the slave may be contented in

his bondage; but the man who can take your life, or restrain your liberty, or despoil you of your property at his discretion, either with his own hands or by means of a hired overseer, owns you, and he can force you to serve him. All you are and all you have, including your wives and children, are his property. If my learned and very good friend, the attorney general, had this right of domination over me, I should not be very much frightened, for I should expect him to use it as moderately as any man in all the world; but still I should feel the necessity of being very discreet. He might change in a short time. The thirst for blood is an appetite which grows by what it feeds upon. We cannot know him by present appearances. Robespierre resigned a country judgeship in early life because he was too tender hearted to pronounce sentence of death upon a convicted criminal. Caligula passed for a most amiable young gentleman before he was clothed with the imperial purple, and for eight months afterwards. It was Trajan, I think, who said that absolute power would convert any man into a wild beast, whatever was the original benevolence of his nature. If you decide that the attorney general holds in his own hands, or shares with others, the power of life and death over us all, I mean to be very cautious in my intercourse with him; and I warn you, the judges whom I am now addressing, to do likewise. Trust not to the gentleness and kindness which have always marked his behavior heretofore. Keep your distance; be careful how you approach him; for you know not at what moment or by what a trifle you may rouse the sleeping tiger. Remember the injunction of Scripture: 'Go not near to the man who hath power to kill; and if thou come unto him, see that thou make no fault, lest he take away thy life presently, for thou goest among snares, and walkest upon the battlements of the city.'

"I admit that, if the commander in chief or any other officer of the government has the power of an Asiatic king, to butcher the people at pleasure, he ought to have somebody to aid him in selecting his victims, as well as to do the rough work of strangling and shooting. But if my learned friend will only condescend to cast an eye upon the constitution, he will see at once that all the executive and military officers are completely relieved by the provision that the life of a citizen shall not be taken at all until after legal conviction by a court and jury.

"You cannot help but see that military commissions, if suffered to go on, will be used for most pernicious purposes.

I have criticized none of their past proceedings, nor made any allusion to their history in the last five years. But what can be the meaning of this effort to maintain them among us? Certainly not to punish actual guilt. All the ends of true justice are attained by the prompt, speedy, impartial trial which the courts are bound to give. Is there any danger that crime will be winked upon by the judges? Does anybody pretend that courts and juries have less ability to decide upon facts and law than the men who sit in military tribunals? The counsel in this cause will not insult you by even hinting such an opinion. What righteous or just purpose, then, can they serve? None, whatever. But while they are utterly powerless to do even a shadow of good, they will be omnipotent to trample upon innocence, to gag the truth, to silence patriotism, and crush the liberties of the country. They will always be organized to convict, and the conviction will follow the accusation as surely as night follows the day. The government, of course, will accuse none before such a commission except those whom it predetermines to ruin and destroy. The accuser can choose the judges, and will certainly select those who are known to be the most ignorant, the most unprincipled, and the most ready to do whatever may please the power which gives them pay, promotion, and plunder. The willing witness can be found as easily as the superservicable judge. The treacherous spy and the base informer—those loathsome wretches who do their lying by the job—will stock such a market with abundant perjury, for the authorities that employ them will be bound to protect as well as reward them. A corrupt and tyrannical government, with such an engine at its command, will shock the world with the enormity of its crimes." See Veeder's Legal Masterpieces.

May each who has taken the oath to support the constitution merit the engraving upon the stone which marks his or her last home, the epitaph written by Judge Black's biographer:

"Jealousy of all power, political or corporate, which threatened to abridge the freedom of man, was the motive force in Judge Black's professional and political career —'protection to the man against the ill-used or ill-gotten power of government, corporations, and associations; protection to the states against federal encroachment.' "

The president of the United States in a radio address March 2, 1930, when he was governor of the state of New York and then being considered as a candidate for the highest office in the gift of America, spoke, in part, as follows for preservation of constitutional safeguards:

"As a matter of fact and law, the governing rights of the states are all of those which have not been surrendered to the national government by the constitution or its amendments. Wisely or unwisely, people know that under the eighteenth amendment [intoxicating liquor prohibition amendment, ratified January 15, 1919, which was repealed December 5, 1933, by the twenty-first amendment to the constitution] congress has been given the right to legislate on this particular subject, but this is not the case in the matter of a great number of other vital problems of government, such as the conduct of public utilities, of banks, of insurance, of business, of agriculture, of education, of social welfare and of a dozen other important features. In these, Washington must not be encouraged to interfere. . . . The preservation of this 'home rule' by the states is not a cry of jealous commonwealths seeking their own aggrandizement at the expense of sister states. It is a fundamental necessity if we are to remain a truly united country."

In an address (see 13 Va. Law Reg. (N. S.) 513) entitled "Thomas Jefferson and the Golden Age of the Old Dominion," John Carlisle Pryor said:

"Strange as it may seem, this man, the world's greatest exponent of democracy, was born an aristocrat. . . . As a youth, he had all the advantages that wealth and social position could give. . . . As an educator, he drew the first bill for the establishment of a public school system. . . . He regarded the education of American youth as an absolute essential to the maintenance of a free government. . . . He was filled with disgust at those who make a public show of religion and at the intolerance shown in the quarrels among creeds. Therefore, his enemies accused him of atheism. However, he was in fact deeply religious. He abhorred a display of feeling in such matters. He believed his particular convictions were a 'subject of accountability to his God alone,' and that 'it is a fair inference that if a life has been honest and dutiful to society, the religion which has regulated it cannot be

a bad one.' . . . Jefferson stood for a construction that by the Constitution the people had established a government of limited powers. None of its departments could legally go beyond the authority given it,—not even Congress, the assembled representatives of the people themselves. He said:

" 'An elective despotism was not the government we fought for. It would be a dangerous delusion if our confidence in the men of our choice should silence our fears for the safety of our rights. Confidence is everywhere the parent of despotism. Free government is founded in jealousy, not in confidence. It is jealousy, and not confidence, which prescribes limited constitutions to bind down those whom we are obliged to trust with power. Our constitution has accordingly fixed the limits to which, and no further, our confidence will go. In questions of power, then, let no more be heard of confidence in man, but bind him down from mischief by the chains of the Constitution.' "

"Since Jefferson, 'we, the people, charter governments.' Formerly, governments chartered the liberties of the people. The Jeffersonian ideas of individual rights and the limitations upon governments constitute the true theory of our fundamental law. They were put into practice by him in his statute for religious freedom, in his opposition to the Alien and Sedition Laws, and in his support of the States against encroachments of the general government, and in other ways. Alexander Johnson, Professor of Jurisprudence at Princeton, said:

" 'There is hardly any point in which the action of the individual American has been freed from government restraint, from ecclesiastical government, from sumptuary laws, from restrictions on suffrage, from restrictions on commerce, production and exchange, for which he is not indebted to the work and teachings of Thomas Jefferson.'

"When he assumed the office of President in 1801, Jefferson wrote the legislature of Rhode Island:

" 'The Constitution shall be administered by me according to the safe and honest meaning contemplated by the plain understanding of the people at the time of its adoption.'

"The declarations of his first inaugural have become axioms with us regardless of party: 'equal and exact justice to all men, . . . a wise and frugal government . . . which should restrain men from injuring one another, but otherwise leave them free to regulate their own pur-

suits, . . . to support the state governments in all their rights, . . . the preservation of the general government in its whole constitutional vigor,' as the sheet anchor of our peace at home and safety abroad, 'to cultivate peace with all nations, entangling alliances with none,' —how fortunate indeed are we that our nation was so early committed to such policies.

"After serving for eight years as President, Jefferson could have been, beyond any question, reelected almost without any opposition. Washington had refused a third term because of personal disinclination to serve longer. Jefferson's position on this matter, as on all such matters, was based upon principle., Finally, in response to addresses of state legislatures and numerous organizations, urging him to again be a candidate, he replied:

" 'If the principle of rotation be a sound one, as I conscientiously believe it to be with respect to this office, no pretext should ever be permitted to dispense with it; because there never will be a time when real difficulties will not exist and furnish a plausible pretext for dispensation.'

"In his old age, at the conclusion of Monroe's second term, he said:

" 'The example of four presidents, voluntarily retiring at the end of their eighth year, and the progress of public opinion that the principle is salutary, have given it in practice the force of precedent and usage.'

"This precedent, established by Jefferson, has now, after 118 years, become as firmly embedded in our constitutional structure as if it had been written into the Constitution itself. All honor to our present president [President Coolidge in 1928] for recognizing it, as he has apparently done. It is a tradition of incalculable value to the republic, if not quite essential to its perpetuity.

"As it has been often said, no free government or the blessings of liberty can be preserved to any people but by frequent recurrence to fundamental principles. The best way to study those principles is thru the study of the lives of the men who had a part in their development."

Subsequent to circulation of foregoing dissent and that of Judge Steinert, pages six to ten of the second original opinion were rewritten.

I am not ready to admit, even *arguendo*, the constitutionality of the reconstruction finance corporation enact-

ment nor that, fundamentally, it and the farm credit act are indistinguishable in principle.

*McCulloch v. Maryland, supra,* which is invoked in the majority opinion, is not contrary to dissenting views of Judge Steinert and the undersigned. Chief Justice Marshall, speaking for the United States supreme court in the case cited, followed the opinion written in 1791 by secretary of the treasury Hamilton on the constitutionality of an act providing for the incorporation of a national bank, as an instrument of great utility in the operations connected with the support of public credit. An examination of Mr. Hamilton's opinion and the opinion written by Chief Justice Marshall for the United States supreme court will not disclose that either author was of the view that the power of engaging in private business was a function of government. The two opinions hold no more than that the Federal government has the power to create a corporation as an instrument in the operations connected with the support of the government, with which the states may not interfere. There is no language in either opinion from which it may reasonably be inferred that the power of creating a corporation may constitutionally be extended to effect the purpose of placing the Federal government in private business enterprises, as is contended in the majority opinion. Nor is there aught in either opinion that the declaration of Congress that a bureau, tribunal, or corporation is an agency or instrumentality of the United States, forecloses the question whether such bureau, tribunal, or corporation is engaged in a business enterprise and therefore subject to the same conditions as a private citizen.

The president of the United States, then governor of the Empire state, in 1930 urged (see excerpt above from that address) preservation of the rights of the states. It is reported that he also warned, as follows, against centralization of all authority and control in our national government:

"To bring about government by oligarchy—masquerading as democracy—it is fundamentally essential that all authority and control be centralized in our National Gov-

ernment. We are safe from the danger of any such departure from the principles by which this country was founded just so long as the individual home rule of the states is scrupulously preserved and fought for whenever they seem in danger."

*United States v. Butler,* 297 U. S. 1, 68, 80 L. Ed. 477, 56 S. Ct. 312, is in harmony with the views expressed by the present president of the United States in 1930. In the case cited, the United States supreme court decided that the phase of the agricultural adjustment act was unconstitutional which attempted to control agriculture by securing a decrease in the production of certain farm products and thereby increase prices, with the farmers who decreased production in accordance with agreements with the secretary of agriculture receiving a bounty appropriated from certain taxes levied by the government therefor. It was invalid in that it invaded the power reserved to the states and that the taxation, appropriation for payments, and distribution of the moneys were all means to an unconstitutional end. The court said:

"The act invades the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government. The tax, the appropriation of the funds raised, and the direction for their disbursement, are but parts of the plan. They are but means to an unconstitutional end."

In *Arkansas-Missouri Power Co. v. Kennet,* 78 F. (2d) 911 (C. C. A. 8th), it was held that, where a city in order to receive loans or grants appropriated by the Federal government, as a condition attached thereto, agrees to make an illegal delegation of its legislative powers to the Federal government, such as control over plans, constructions, materials, and labor, such agreement is invalid.

We took an oath to support the constitution. May it not be justly charged that, when faced with the fearful facts which now confront us, we remained in a fog of indecision or cowardice? We must function as judges, states-

men if you please, mindful of our duty to the next generation.

STEINERT, J. (dissenting)—The basis of the majority opinion is that the respondent, *production credit association*, is an "instrumentality of the United States." If that premise be accepted as an indisputable postulate, then the conclusion reached by the majority must likewise be recognized as unerringly correct, because it is fundamental in our system of government that "the states have no power to tax, impede, or control in any way the operation of laws constitutionally enacted by Congress to carry out the power vested in the National Government."

Assuming, for present purposes, that the farm credit administration, the Federal land banks, and the production credit corporations, spoken of in the majority opinion, are "instrumentalities of the United States," I am unable to agree that production credit *associations*, such as respondent herein, are also such Federal instrumentalities. While it is true that the farm credit act of 1933 (12 U. S. C. A., § 1131 *et seq.*) authorizes the creation of production credit associations, the actual organization of such associations is brought about, as declared in § 1131d of the act, by the filing of articles of incorporation "by ten or more farmers desiring to borrow money under the provisions of this section [and other sections]" of the act. The loans made by the associations to the farmers are "for general agricultural purposes."

Whether the transaction involving the particular loan be viewed from the standpoint of the government or from the standpoint of the farmers, in either event it is, in my opinion, simply a commercial transaction such as that involved between an ordinary bank and a borrower, and is in no sense the exercise of a sovereign power or governmental activity on the part of the Federal government. In short, I am of the opinion that in such transactions the government steps down from its plane of sovereignty and enters the domain of ordinary commercial business, and for that reason the agency employed therefor by the gov-

ernment is amenable to state laws governing individuals and corporations engaged in a similar business.

I am aware that, as stated in the majority opinion, Congress itself has declared, in the act, that such production credit associations are "instrumentalities of the United States." But the mere assertion by Congress that a particular organization is a Federal instrumentality does not of itself make it so, when the method of operation of the particular agency or activity indicates the contrary. And such assertion by Congress is the very element in this case which gives me the greatest concen, for if the *ipse dixit* of Congress forestalls all further inquiry or consideration, then by the simple device of creating an agency or bureau and labeling it an "instrumentality of the United States," the various states can, and in time will, be shorn of every function and activity in which they have immemorially and traditionally engaged. The slow, but gradual, progress of Congressional assertion of exclusive authority may not at any one point reveal its ultimate objective or result, but even now it appears to me to be discernible that ere long the "sovereign states" themselves will be regarded as no more than "instrumentalities of the United States."

I dissent from the majority opinion on the ground that the respondent production credit association is not, in fact, an instrumentality of the United States.

SIMPSON, C. J., concurs with STEINERT, J.

September 22, 1944. Petition for rehearing denied.